**SELECT CREATIONS, INC., a Wisconsin corporation, Plaintiff,**

**v.**

**PALIAFITO AMERICA, INC., an Illinois corporation, Defendant, Counterplaintiff and Third–Party Plaintiff,**

**v.**

**Miryoung (or "Mi Ryoung") LEE a/k/a "Joy Lee", et al., Third–Party Defendants.**

No. 91–C–1240.

United States District Court, E.D. Wisconsin.

May 1, 1995.

iafito America, Inc. ("Paliafito"), to hold Joy Lee, Jerry Lee, and David Loeffler, Esq. in civil contempt of court for violating several orders of this Court. Paliafito alleges the following contempts of court: (1.) that Joy Lee destroyed documents in violation of this Court's order; (2.) that Joy Lee opened a new bank account in violation of this Court's order; (3.) that Joy and Jerry Lee violated this Court's order by causing Grip Toy products and money to be transferred between and among various defendant corporations; and (4.) that Joy Lee, aided and abetted by David Loeffler, violated this Court's order by selling her stock in MAI Inc.

For the following reasons, Paliafito's motion will be granted in part and denied in part.

### FINDINGS OF FACT

#### I. THE ACTORS

1. Paliafito America, Inc. ("Paliafito"), an Illinois corporation, is a defendant-counterplaintiff in the underlying action, *Select Creations v. Paliafito*, Case No. 91–C–1240, and the plaintiff in this contempt proceeding.

2. Miryoung ("Joy") Lee and Jong Sik ("Jerrold" or "Jerry") Lee, husband and wife, are third-party defendants in the underlying case and defendants in this action. They are partners in the manufacture and sale of the "Grip Toys" line of products. (PX 32, ¶¶ 4–7).[1]

3. Joy Lee, formerly a citizen of South Korea, is a naturalized United States citizen who resided in the State of California during all times relevant to this motion. (1 Tr. 80: 2–5 (Lee)). She is a counterdefendant in the underlying litigation, and is named as one of the "Mantae defendants" in this Court's First Supplemental Writ of Attachment, Preliminary Injunction, and Appointment of Receiver ("the First Supplemental Writ"). (PX 100 ¶ 1). Until May of 1993, Joy Lee was President and CEO of MAI, Inc. (4 Tr. 816: 19–21); (PX 109). Until at least July 8, 1993, Joy Lee owned the issued and outstanding

Harold A. Laufer, Davis & Kuelthau, Milwaukee, WI, David Springer, John Lyons, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for Defendant and Third Party Plaintiff.

David F. Loeffler, Greg Peters, Krukowski & Costello, Milwaukee, WI, for Miryoung Lee.

### DECISION AND ORDER

WARREN, District Judge.

Now before the Court is the motion of defendant-counterplaintiff and plaintiff Pal-

---

1. For clarity of reference, in the following proposed findings and conclusions, Miryoung ("Joy") Lee is sometimes referred to simply as

"Joy," and Jong Sik ("Jerrold" or "Jerry") Lee is sometimes referred to simply as "Jerry."

stock of MAI, Inc. (PX 136 and PX 242 (stock transfer)).

4. Jong Sik ("Jerry") Lee is a citizen and resident of Korea and the husband of Joy Lee. He is one of the counterdefendants in the underlying litigation and one of the "Mantae defendants" as defined in the First Supplemental Writ. (PX 100, ¶ 1). Jerry Lee was the majority owner of the Korean company, MAI, Ltd.

5. David Loeffler, Esq., is a partner in the law firm of Krukowski & Costello, S.C. He has been counsel of record for the Lees since April 27, 1993. (8 Tr. 1655: 3–5 (Loeffler).)

6. Many Amazing Ideas, Inc. ("MAI") is an American corporation which was owned and operated by Joy Lee. MAI was primarily engaged in the business of importing and distributing Grip Toy products. On February 22, 1993, MAI filed a Chapter 11 bankruptcy petition. MAI operated as a debtor-in-possession ("DIP") until December 8, 1993, when a Chapter 7 trustee was appointed.

7. From April 2, 1993 until May 28, 1993, Robert Wilcox was Chief Operating Officer of MAI, and from May 28, 1993 until at least December 8, 1993, Wilcox was also President, Chief Executive Officer, Treasurer, and Secretary of MAI. (6 Tr. 1108: 2–12 (Wilcox)).

8. MAI Ltd. was the Korean operation owned and operated by Jerry Lee which, until December of 1992, was the principal supplier of Grip Toy products to MAI, Inc. (3 Tr. 575; 8–576: 12; 583: 8–25 (Lee)). MAI, Ltd. is defined as one of the "Mantae defendants" in the underlying action.

## II. BACKGROUND

### A. The Underlying Action

9. On December 11, 1991, Paliafito filed its first amended counterclaim and third-party complaint in this action, alleging that the Lees and MAI had breached their contract with Paliafito, committed frauds against Paliafito, and violated the Racketeer Influenced and Corrupt Organizations Act. Paliafito also moved for preliminary writs of attachment and a preliminary injunction, on the grounds, among others, that the Lees and MAI were remitting virtually all of the proceeds from the sale of Grip Ball back to Korea so that, even if and when Paliafito obtained a judgment, there would be no funds in the United States left to satisfy it. See Select Creations, Inc. v. Paliafito America, Inc., 830 F.Supp. 1213, 1215 (E.D.Wis. 1993).

10. This Court conducted hearings on Paliafito's motion for four days in January and another six days in April 1992. Id. During the course of the 1992 hearings, Paliafito presented strong evidence that the Lees operated a web of corporate pools through which they could transfer and hide assets. (PX 32 at 195 (Conclusions of Law ¶ 89(c))).

11. As more fully described below, after Paliafito filed its counterclaim and motion, the Lees began to take steps designed to frustrate the orders this Court might—and ultimately did—enter to preserve evidence and to protect Paliafito's ability to collect a judgment. The totality of the evidentiary record before this Court, together with Joy Lee's demeanor while testifying before this Court, her repeated impeachments on prior inconsistent statements (many of them sworn), her evasive manner of testifying, the absurdity of some of her "explanations," compels the conclusion that the Lees have engaged in a pattern of willful, and flagrant contempts of this Court's orders.

### B. The Lees Control Several Corporations Worldwide Through Which They Can Hide Assets

12. Puff Pac Production Limited and Mi Jong Industries were Lee-controlled companies located in Korea.

13. During the evidentiary hearings on Paliafito's motion for a writ of attachment in early 1992, Paliafito identified Puff Pac Productions as being part of the Lees' corporate pool. (PX 32 at 5, Findings of Fact ¶¶ 14–16).

14. Puff Pac Productions was engaged in the manufacture of Grip Ball products and was owned by Jerry Lee and his family. (PX 32 at 5, Findings of Fact ¶¶ 15–16).

15. At the time, Jong Ok Lee, Jerry's brother (5 Tr. 858: 2–4 (Lee)), and Ho Seop Song, Joy's brother (1 Tr. 140: 5–7 (Lee)), were the directors of Puff Pac Productions Limited. (PX 18).

16. On April 15, 1992, almost immediately after the close of the evidentiary hearings, Puff Pac Production Limited changed its name to "Mi Jong," and Jong Ok Lee and Ho Seop Song resigned as directors. (PX 18).

17. "Mi Jong" had been the name of another Lee-controlled company (1 Tr. 141: 11–21 (Lee)) which, on February 10, 1992, had changed its name to "Mai Moolsan." (PX 20). Jerry had been auditor of that company, but on August 7, 1992, it was wound up by vote of the shareholders and Jong Ok Lee, Jerry's brother, was appointed liquidator. (PX 20).

18. Puff Pac/Mijong obtained over $3 million from the sale of Grip Ball. (PX 53 at MAI–86).

19. The Lees control the Indonesian manufacturing company, P.T. Kartika Sinarnusa Semesta ("PTKSS"), also called PTMJ Products. (1 Tr. 102–103: 2–25, 1–14 (Lee)).

20. On June 12, 1992, Nowak faxed a power of attorney to Joy Lee which authorized Jong Ok Lee, Jerry's brother, to act on behalf of MAI in connection with setting up an Indonesian operation. (PX 3).

21. Starting in June 1992, Joy caused MAI to invest over $255,000 of MAI money in the Indonesian operation. (PX 6).

22. In the summer of 1992, Jong Ok Lee set up and ran PTKSS. Jong Ok Lee used money obtained from the sale of Grip Ball to start the Indonesian operation. (1 Tr. 187: 13–16 (Lee)).

23. Jong Ok Lee worked in the Grip Ball business. (1 Tr. 187: 10–12 (Lee)). He was one of the original owners of Puff Pac Production, later renamed Mijong Industries. (5 Tr. 858: 8–25 (Lee)).

24. Joy Lee testified that Jong Ok Lee was the owner of PTKSS and that MAI had some investment in the operation. (5 Tr. 863: 8–13 (Lee)). On a corporate application dated August 5, 1992, MAI is listed as the 95% owner of the Indonesian joint venture, and Jong Ok Lee is listed as a representative of MAI. (PX 5 at pp. 1 & 4).

25. The setup of the Indonesian operation was not documented, but rather was formed pursuant to an oral arrangement. (5 Tr. 857–58: 9–25, 1 (Lee)).

26. On August 20, 1992, Joy requested her office to Federal Express to Nowak three blank checks, documents relating to the establishment of the Indonesian operation, and financial statements relating to the Korean companies. (PX 4).

27. Joy claimed that she had "oral understandings" with her brother-in-law, Jong Ok Lee, that if MAI invested a given amount in the Indonesian operation, he would "give" back his stock in the Indonesian operation to MAI. (5 Tr. 857–58: 9–25, 1 (Lee)).

28. The Lees' attorneys provided advice to them on protecting their assets.

29. On May 29, 1992, L. Michael Rudolph, Esq. provided Keith Nowak, Esq. with a draft memorandum which outlined a plan to insulate the Lees' corporate assets from creditors via corporate structure and organization. (PX 278). The memorandum was produced from MAI's files. (PX 278 at Bates MAI 1120).

30. On September 1, 1992, Dick Ferdinand, a financial consultant, at Merrill, Lynch, wrote to Joy regarding her plans to restructure her companies and to prepare for a public offering. (PX 9). He wrote that she would "be in a much stronger and safer position if a significant portion of [her] personal net worth [was] separate from her holdings in MAI" and suggested that they meet to "plan a strategy" to accomplish this goal. (PX 9).

31. Joy's financial advisors viewed the Korean and Indonesian operations as parts of the Lees' corporate holdings.

32. On October 14, 1992, Merrill Lynch submitted a proposal, which was accepted by Joy on behalf of Grip Toys, Inc., "to conduct a strategic analysis ... for Grip Toys, Inc. and its affiliates Scatch Europe B.V., M.A.I., Ltd. Co., and M.A.I. Indonesia.... to determine the amounts that might be realized through a financial recapitalization involving

a private placement or a public offering of debt or equity securities." (PX 10 at 1).

33. One of the stated objectives was "to determine the valuation of the Company [previously defined as Griptoys, Inc., *and its affiliates Scatch Europe B.V., M.A.I., Ltd., Co., and M.A.I. Indonesia as a whole and for its three principal operations (United States, Korea, and Indonesia) individually.*" (PX 10 at 1) (emphasis added).

34. Joy Lee herself even indicated that the Korean and Indonesian operations were under her control.

35. In the autumn of 1992, Joy created several charts (PX 12, 13A, 13B) which indicated that PTMJ Products (the Indonesian operation) was owned 100% by MAI. The charts also indicate that "Mi Jong" or "Mijong Korea" were affiliated with MAI. "Mi Jong" was owned by a "Lee Family Member." (PX 13A, 13B). Joy affirmed that Jerry's brother started Mi Jong. (1 Tr. 160: 15–16 (Lee)).

36. The accounting firm of Coopers & Lybrand viewed the Korean and Indonesian operations as affiliated with the Lees.

37. In work papers prepared by Coopers & Lybrand on or about November 30, 1992, the firm examined transactions between MAI and "related parties." (PX 146; PX 147). In plaintiff's exhibit 146, Coopers & Lybrand noted that "MAI purchases inventory from the following *related parties 1) MAI, Ltd., 2) Mijong Industry Inc. 3) Puff Pac Production Inc.*" (PX 146) (emphasis added). In plaintiff's exhibit 147, Coopers & Lybrand noted that "MAI purchases inv[entory] from related parties, earns commissions from related parties, and has loans to employees, stockholders and affiliated companies" and that "Joy Lee (only BOD member) approves all material related party transactions." (PX 147).

### C. *The Value of the Lees' Companies*

38. On October 18, 1992, in a memorandum written in Korean to her husband, Joy reported that "according to our financial statement ... 30% of our stock value is approximately $20,000,000 to $35,000,000." Joy also testified that she wrote in PX 11

"we will evaluate Korea, USA, Indonesia or all separately in order to maximize the value of the whole package." (1 Tr. 156: 14–16, 157: 1–13 (Lee)).

39. As of December 1992, MAI was an $80 million business. (2 Tr. 223: 3–8 (Lee)).

40. In one and one-half years, world-wide Grip Toys sales exceeded $84 million. (PX 53)

41. In 1992, the Lees' Korean operation exported over 35% of the Republic of Korea's total toy exports. (2 Tr. 223: 9–17 (Lee)).

42. The success of Grip Toys' sales led to the Lees' accumulation of nearly $30 million in assets in Korea. (3 Tr. 575: 16–20 (Lee)); (PX 15 at p. MAI–844, MAI–845).

43. MAI, Ltd. in Korea also recognized substantial profits. For *the six month* period ending June 30, 1992, MAI, Ltd. enjoyed net income before taxes of $4.3 million. (PX 15 at MAI 848; PX 144 at pp. 1–4).

44. From February 23, 1992 until December 28, 1992, MAI, Inc. in the United States transferred over $8.9 million to Korea to MAI Ltd., Mantae Co. and PTKSS Indonesia. (PX 57 at 4 & 30; PX 64). These funds transferred to Korea reduced the debt owed to the Korean banks by Jerry Lee and his companies (2 Tr. 261: 1–7 (Lee)) and correspondingly reduced the banks' claim against the collateral securing that debt. (1 Tr. 174–75: 25, 1–11 (Lee)).

45. Joy Lee amassed a personal net worth in the United States, as of November 19, 1992, of $3.2 million. (PX 26 at p. MAI 1120–3242).

46. Joy Lee maintained personal assets in bank accounts in at least one foreign country. She maintained a personal bank account at the Hong Kong Bank in Vancouver, Canada (1 Tr. 87–88: 9–25, 1–3 (Lee)), and she used that account to bring money into the United States to settle a lawsuit. (1 Tr. 90–91: 11–25, 1 (Lee)).

### D. *This Court's December 1st Decision and Order*

47. On December 1, 1992, 828 F.Supp. 1301 the Court issued its Decision and Order requiring the Mantae defendants to make

available sufficient assets to be attached and finding that Paliafito had established a likelihood of proving that the Mantae defendants had engaged in fraud and racketeering. (PX 32).

48. At the end of November 1992, Joy was aware that the Court was about to render this decision. (1 Tr. 187–88: 17–20, 6–23 (Lee)). Also pending was Paliafito's motion for leave to file a second amended counterclaim to add, among other parties, MAI, Ltd. *Select Creations, Inc. v. Paliafito America, Inc.*, 830 F.Supp. at 1215, (referencing the Motion of Paliafito America, Inc. for Leave to File a Second Amended Counterclaim and Third–Party Complaint (filed April 17, 1992)). By the end of November, it was the Lees' plan to close the Korean operation and to move the main source of manufacturing of Grip Toy products to Indonesia. (1 Tr. 188: 19–23 (Lee); PX 23).

### E. *MAI, Ltd.'s Purported Bankruptcy*

49. The Lees claim that on December 26, 1992, MAI, Ltd. went into bankruptcy in Korea. (PX 37; 5 Tr. 891 (Lee)).

50. For the following reasons, the Court finds the Lees' claim to be false.

51. Based on the Declaration of Min Han, submitted in support of Paliafito's First Request for a Determination of Foreign Law on its Contempt Motion, the Court makes the following determinations of foreign law under Rule 44.1 of the Federal Rules of Civil Procedure:

(1) that, under Korean law, an insolvent corporation, or creditors, may wind up the corporation's affairs in one of the following three ways:

(a) liquidation under the Korean Bankruptcy Law (Declaration of Min Han ("Han Dec.") ¶¶ 3–4);

(b) corporate reorganization under the Corporate Reorganization Law (Han Dec. ¶¶ 5–6);

(c) dissolution and liquidation by resolution of shareholders or otherwise in accordance with the Korean Commercial Code (Han Dec. ¶¶ 8–9);

(2) that, under the Korean Civil Procedures Law, the commencement of a bankruptcy or a corporate reorganization proceeding is registered on the company registry on file with the Commercial Recording Office of the District Court in the district where the corporation resides (Han Dec. ¶¶ 4–6);

(3) that, under the Korean Commercial Code, when a corporation is dissolved by a resolution of shareholders, the corporation must register such dissolution on the company registry on file with the Commercial Recording Office of the District Court in the district where the corporation resides (Han Dec. ¶ 9); and

(4) that, under the Korean Civil Procedures Law, a shareholder or a creditor of a corporation may request a certified copy of court records relating to a bankruptcy or a reorganization proceeding commenced on behalf of the corporation.[2] (Han Dec. ¶ 7).

52. As set forth above, if a bankruptcy, a reorganization proceeding, or a voluntary dissolution has indeed been commenced on behalf of MAI, Ltd., the fact of such commencement would be reflected on its company registry, plaintiff's exhibits 16 and 17. It is not. Accordingly, the Court finds that MAI, Ltd. never went into bankruptcy or any other proceeding to liquidate its assets.

53. However, it is possible that MAI Ltd. may have been technically insolvent, though still legally in existence as a "Company in Dormancy." (Declaration of Jin Ouk Kim at 5–7).

### F. *Creation of MJ Korea as the Lees' Korean Front*

54. For the following reasons, the Court concludes that the Lees created and controlled "MJ Korea" as a front for their operations, including MAI, Ltd. in Korea at least through the summer of 1993.

---

**2.** Both Jerry Lee, as a shareholder of MAI Ltd., and Paliafito, as a creditor of MAI Ltd., could have obtained certified copies of any court proceedings related to MAI's insolvency. Neither party has submitted any such records to the Court.

55. On December 29, 1992, three days after the Lees claim to have put MAI, Ltd. into bankruptcy, MJ Korea was incorporated. (PX 38).

56. According to Joy, in just a few days, people who had worked for Jerry Lee at MAI, Ltd. set up MJ Korea with an investment of about $60,000 and took over an existing Scatch Europe order for hundreds of thousands of sets of Grip Football. (5 Tr. 891–92: 14–25, 1–2 (Lee); 3 Tr. 601: 12–20 (Lee)).

57. Jerry Lee also went to work for MJ Korea and continued to correspond with the Scatch Europe people. (5 Tr. 893: 3–9 (Lee)).

58. Within days after the supposed bankruptcy of MAI, Ltd. and the creation of MJ Korea, the Lees wrote to Scatch Europe to request that payments on Letters of Credit be switched to MJ Korea for games manufactured by Mijong Industries. Thus, on December 31, 1992, Joy sent a letter to Jan Smit at Scatch Europe explaining that "M.A.I. Ltd. will be remained under Chapter 11 (Similar) about 6 months at the most then we will be out of it. I think our plan could have a lot of future benefits if our sales side did not slow down." (PX 40).

59. On January 2, 1993, Jerry sent a letter to Wil Van Bladel at Scatch Europe advising him of MAI, Ltd.'s bankruptcy and the movement of manufacturing to Indonesia. (PX 37).

As you have been informed by Joy, and as we have already explained to you while you were in Korea last month, all the manufacturing facilities under M.A.I. Korea is in the process of being transferred to the facilities in Indonesia. As of December 26, 1992, M.A.I. Korea has decided to file Chapter 11 which in views of others may have either negative or positive implications. (PX 37)

60. Jerry also represented that the production of Grip Football was under *Mi Jong Industry's* control and that payment should be made to *MJ Korea:*

*[T]he production and export of Grip Football has been completely under Mi Jong Industry's control* from the initial

stage. Thus, there will be no problem with the production and supply of Grip Football to Scatch Europe BV. Therefore, I would like to request the following amendments be made on L/C No. 8A/ 9250348: . . .

*The beneficiary of the L/C [should be switched] from M.A.I., Ltd. to M.J. Korea, Ltd.*

(PX 37) (emphasis added).

61. When confronted with Jerry Lee's statement that Grip Football was under Mijong Industries' control, not MJ Korea's control, Joy stated: "[Y]ou sometimes have to say things to make the whole thing work." (5 Tr. 897: 14–15 (Lee)).

62. Plaintiff's exhibits 37 and 42, which demonstrate that Jerry conducted business on behalf of MJ Korea in January and February of 1993, contradict Joy's claim that he had first become employed by MJ Korea when the Hans bought MJ Korea in April 1993. (4 Tr. 743: 5–15 (Lee)).

63. On or around February 1993, Ray George, MAI's vice president for sales, (1 Tr. 167: 7–8 (Lee)), drafted a memorandum which stated:

*MAI is vertical in that it controls its own manufacturing with plants in Korea and Indonesia.* This is not true for many toy companies who depend on outside sources for manufacturing and are thus at the mercy of these outside manufacturers.

(PX 14 at 4) (emphasis added).

64. At the time Ray George's memorandum (PX 14) was drafted, sometime after the February 1993 Toy Fair (5 Tr. 875–76 (Lee)), MAI, Ltd. had purportedly been "bankrupt" for nearly two months and only MJ Korea remained in business.

65. In February 1993, Jerry conducted business on behalf of MJ Korea and MAI, Ltd., entities that shared the same telephone number—his. On February 8, 1993, Jacqueline Jean, an MJ Korea employee, wrote a letter to Pekka Immonen on M.A.I., Ltd. letterhead. Ms. Jean wrote, "I was informed last weekend from our head quarter in L.A. that we M.A.I., Ltd. had just given the exclusive right of European Market to a distribu-

tor and exporter 'Scatch Europe' in Netherland." (PX 41).

66. The February 8th letter, written on M.A.I., Ltd. letterhead, lists the telephone numbers for M.A.I., Ltd. to be 582–0551 and 582–0553. (PX 41).

67. On February 12, 1993, Jerry wrote a letter to Wil Van Bladel at Scatch Europe on MJ Korea letterhead. (PX 42) The letterhead for MJ Korea lists telephone numbers 582–0551 and 582–0553, the same telephone numbers which M.A.I., Ltd. listed on its letterhead on plaintiff's exhibit 41. The number 582–0551 was also Jerry's home telephone number. (1 Tr. 210: 3–15 (Lee)).

68. In order to explain how Jerry's home telephone number could be the same as MJ Korea's, Joy claimed at the hearing on December 13, 1993, that Jerry "moved" M.J. Korea's telephone number, 582–0551, to his home after M.J. Korea moved to bigger offices. (1 Tr. 210–11: 12–25, 1–5 (Lee)). She affirmed that Jerry was then using this telephone number as his home telephone number. (1 Tr. 212: 10–12 (Lee)).

69. Later, at the hearing on January 5, 1994, she changed her testimony. Joy testified that MJ Korea's first office was in a residential apartment that Jerry had occupied:

> Actually, I clearly found out afterward because I wasn't sure what happened, was between, and so I called and found out they had a small office, MJ Korea had small office, very beginning, which was not an office, but [in] Korea there's really [no] rule that residential area cannot be used for office, there's no rule for that. So the office of MJ very initially was in an apartment. So MJ had got the phone number from the phone company of 582–0551. At the time Jerry didn't have a place to stay, because the real estate where he used to stay was collateralized to the bank, so they had to kick him out. So he stayed in one of the rooms of the MJ's office, which was an apartment, so MJ moved out from this apartment to office later, and Jerry stayed there for longer than MJ moved out.

(5 Tr. 900: 4–21 (Lee)).

70. Although Joy claimed that 582–0551 was "never" MAI, Ltd.'s phone number (5 Tr. 901: 6–9 (Lee)), an MAI, Ltd. fax (PX 41) shows otherwise.

71. The Korea Exchange Bank ("KEB"), from whom the Lees had obtained financing, also treated MJ Korea as an operation controlled by and affiliated with the Lees. The Korea Exchange Bank acted as the agent for all of the other Korean banks to which MAI and the Lees owed money. (2 Tr. 232: 3–6 (Lee)).

72. On January 13, 1993, the manager of the Korea Exchange Bank's Nonhyun-dong South Branch faxed a letter to "Miryoung Song" (*i.e.*, Joy Lee), enclosing a UCC security agreement to be signed. (PX 46). The KEB's branch manager also linked future financing to MJ Korea to payment of the MAI, Ltd. debt:

> I would like to request your cooperation to pay back the credit you have with our bank before the end of January 1993, either by selling out the items in stock in the U.S. ... or by completing the sales of the company which has opened the stand by L/Cs.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> As you already know, not only our branch is in the very difficult situations but also *in order for us to offer financial support for the newly established company M.J. Trading Co., Ltd., the delayed payment for the dishonored credit by MAI Korea should be cleared off as soon as possible.*

(PX 46) (emphasis added).

73. On January 20, 1993, Joy signed a security agreement on behalf of MAI pledging all of MAI's assets to secure obligations to the Korea Exchange Bank, Jerry, Mijong Industries, Inc., and MAI, Ltd. (PX 43). The Korean Exchange Bank had requested the law firm of Kellow & George to prepare the security agreement documents. (PX 45). (Joy and Jerry had personally guaranteed the "documents upon acceptance" ("D/A") obligations to the Korean banks. (2 Tr. 228: 4–9 (Lee))).

74. Thereafter, the Korea Exchange Bank did, in fact, provide D/A financing to

MJ Korea. (5 Tr. 904–06: 1–25, 1–25, 1–2 (Lee)).

### G. *MJ Korea Sold to Han Family*

75. This Court has already found that "[o]n April 21, 1993 the Hans purchased eighty-five percent of the shares of MJ Korea. A fifteen percent interest was retained by Jong Ok Choi, a member of the original shareholder group." *Select Creations, Inc. v. Paliafito America, Inc.*, 852 F.Supp. 740, 748–49 (E.D.Wis.1994) (citations to record omitted). (*See also* PX 38, 39; 3 Tr. 606: 17–607: 16; 5 Tr. 1028: 14–19; 7 Tr.1384: 8–1387: 8 (Wilcox)).

76. The Court further concluded that Min Suk Han was elected chairman and representative director of MJ Korea, and that, "[t]hereafter, the Hans, through MJ Korea, ostensibly conducted the Grip Toys business." *Select*, 852 F.Supp. at 749 (citations to record omitted). (*See also* PX 38, 39; 7 Tr. 1371: 4–11 (Wilcox)).

77. Mr. Min Suk Han is a Korean business man, approximately 72 years of age. (7 Tr. 1407: 1 (Wilcox, J. Lee)). He is no relation by blood or marriage to Joy or Jerry Lee. (3 Tr. 607: 3–4; 8 Tr. 1599: 7–10 (Wilcox, J. Lee)).

78. Ms. Yang Ok Han is also a Korean national. She is the daughter of Min Suk Han, and a director of MJ Korea (PX 38, 39). She is not a relation of the Lees. (8 Tr. 1599: 7–10).

79. Despite the sale of the MJ Korea stock to the Hans, the Lees continued to exercise control over the operations of MJ Korea, at least through the summer of 1993. *See Select*, 852 F.Supp. at 749–50. (*See also* FOF 158; 159, *infra*.)

80. Moreover, on July 14, 1993, Russell Clementson, an attorney with the United States Trustee's Office, met with Herbert Katz and Alison Zirn from Stroock & Stroock & Lavan, the law firm representing MAI Inc. in bankruptcy. (5 Tr. 1041–42: 16–18, 15–16 (Clementson)). Mr. Clementson asked what the relationship of MJ Korea to MAI was. (5 Tr. 1042: 8–12 (Clementson)). Mr. Clementson testified that Katz and Zirn told him they weren't certain who owned or controlled

MJ Korea and that they were investigating. (5 Tr. 1042: 17–21 (Clementson)).

### H. *The February 19, 1993 Writ and MAI's Bankruptcy*

81. On February 16, 1993, the Court heard argument on the issue of how much of the Mantae defendants' assets were to be attached. (PX 60). Before Paliafito brought the matter to the Court's attention on February 16, the Lees had never disclosed that, on December 31, 1992, Joy had given the Lieberman & Nowak law firm a security agreement in MAI's inventory and receivables. (PX 60 at 29–30).

82. On February 18, 1993, Joy submitted a declaration to the Court promising not to pledge MAI assets until such time as the Court determined the proper amount of the attachment. (PX 215). She failed to disclose that one month earlier Joy had *already* pledged all of MAI's assets to the Korean Exchange Bank, her husband, Mijong Industries and MAI, Ltd. (2 Tr. 330–31: 20–25, 1–7 (Lee); PX 43; PX 60 at 71, 73–74).

83. On February 19, 1993, the Court issued the First Supplemental Writ of Attachment, Preliminary Injunction, and Appointment of a Receiver which, in part, required the Mantae defendants to deposit $8 million with the Receiver. (PX 61).

84. On February 22, 1993, MAI, Inc. filed a Chapter 11 bankruptcy petition, prepared and signed by Stroock & Stroock & Lavan ("Stroock"). (PX 63; 68).

85. MAI had been referred to Stroock on January 12, 1993 by letter from James Lee of DeBro & Lee to Herbert Katz of Stroock. (PX 44). James Lee had written to Katz that MAI was interested in filing for Chapter 11 so that the Lees could sell MAI's assets free and clear of liens. He also had noted that MAI had a firm offer for its assets for $20 million. (PX 44).

86. On February 23, 1993, Ray George wrote a memorandum to MAI's sales representatives explaining why MAI had filed a Chapter 11 petition: "[D]ue to the judge's order from Wisconsin in regards to the MAI–Paliafito case, in order to set aside the order from the judge and to continue business as

usual, MAI filed for Chapter 11 protection on February 22, 1993." (PX 73).

87. John Waldron also wrote a memorandum to MAI's office staff for Joy explaining the purpose of MAI's bankruptcy filing: "MAI and Mrs. Lee intend to be on top again." (PX 74).

88. After the bankruptcy petition was filed, one of the very first things that Joy wanted Stroock to do was to look into whether the bankruptcy stay could be extended to cover her and her husband. (2 Tr. 263: 20–24 (Lee)). That was because Joy knew that Paliafito was pursuing her and her husband in court in Wisconsin. (2 Tr. 267: 1–3 (Lee)).

## II. *THE FIRST ALLEGED CONTEMPT: JOY LEE'S VIOLATION OF THE COURT'S JANUARY 24, 1992 ORDER*

89. On January 24, 1992, the Court entered an order providing, in pertinent part, that "[t]he parties or their agents, attorneys, and others under their direction, shall not destroy or dispense with documents until further order of the court." (PX 75).

90. Joy received the Court's January 24, 1992 Order from Nowak. (2 Tr. 331–32: 24–25, 1 (Lee)). Nowak explained the Order to her and she understood it and circulated it among MAI employees. (2 Tr. 332–33: 22–25, 1–4 (Lee)).

91. On February 24, 1993, two days after it filed its bankruptcy petition, MAI circulated a memorandum among its employees which stated:

EFFECTIVE THIS DATE, ALL DOCUMENTS (letters, faxes, etc . . .) ARE NOT TO BE THROWN IN THE TRASH. THEY ARE TO BE PUT INTO A BOX WHICH WILL BE PLACED BY BOTH FAX MACHINES. AT THE END OF EACH DAY, DANNY WILL GATHER ALL PAPERS FOR SHREDDING. THIS IS TO BE DONE SO THAT NO DOCUMENTS FALL INTO THE WRONG HANDS. PLEASE FOLLOW THESE INSTRUCTIONS, INITIAL THE BOTTOM BY YOUR NAME AND RETURN IT TO ME.

(PX 76).

92. The "wrong hands" referred to in the memorandum were Paliafito's. (2 Tr. 333–34: 23–25, 1 (Lee)).

93. Joy and other MAI employees initialed the memorandum. (2 Tr. 333, 334–35: 13–14, 2–25, 1–12 (Lee); PX 76).

94. Pursuant to the memo, documents were destroyed for "security reasons," (2 Tr. 335: 13–15 (Lee)), including documents Joy thought were protected by the lawyer-client privilege. (6 Tr. 1213–14: 14–25, 1–19 (Wilcox)).

95. MAI did not keep a record of documents that were shredded, and there was document shredding going on at times when Joy was not there to see it. (2 Tr. 336–37: 18–25, 1–2 (Lee)). According to Joy, "nobody can know" which documents were or were not shredded. (2 Tr. 342: 9–16 (Lee)).

96. The shredding continued for five or six weeks, or until about April 3, 1993, when Wilcox unplugged the shredder after becoming MAI's chief operating officer. (6 Tr. 1210–12: 19–25, 1–25, 1–7 (Wilcox); 4 Tr. 811: 4–9 (Lee)).

## IV. *CONSIDERATION AND ISSUANCE OF THE APRIL 7TH WRIT*

### A. *The Lees, Stroock, Nowak and Loeffler Confer*

97. In early March 1993, Paliafito circulated its proposed First Supplemental Writ. (PX 81).

98. On March 4, 1993, Arnold Quittner at Stroock wrote a letter to Joy, with a copy to Nowak, reviewing the proposed First Supplemental Writ. (PX 81). Quittner wrote that Joy's stock in MAI was not a marketable security that the receiver could take into possession without violating the automatic stay:

We have also taken the position that the stock in MAI owned by Joy Lee is not a marketable security, and the attempt by the receiver to take it into custody would be an attempt to exercise control over

MAI, which would be a violation of Bankruptcy Code § 362, the automatic stay. (PX 81).

99. Quittner concluded that MAI need not file an opposition to the proposed supplemental writ. (PX 81). Joy read Quittner's letter and discussed it with him. (2 Tr. 353: 21–22 (Lee)).

100. Joy also requested Stroock to give her legal advice with respect to the disposition of her personal assets. (5 Tr. 912: 3–9 (Lee)). On March 5, 1993, Alison Zirn at Stroock faxed a letter to Joy advising her that the February 19th Writ did not "appear to restrict [Joy's] ability to withdraw and use any personal funds or assets, . . ." but did not attempt to "conclusively resolve this issue." (PX 226).

101. As of March 4, 1993, Lieberman & Nowak had filed a motion to withdraw as counsel for MAI and the Lees. (PX 72). On March 8, 1993, Nowak sent a memorandum to David Loeffler setting forth his comments on the proposed First Supplemental Writ. (PX 229). Nowak also faxed a copy of Quittner's March 4 letter to Joy (PX 81) to Loeffler. (PX 230). (8 Tr. 1660–61: 23–25, 1–3 (Loeffler)).

102. Nowak noted that "Arnold Quittner is filing a Section 105 Petition with the bankruptcy Court that would stay the action with respect to Joy and may attempt the same thing with respect to Jerry." (PX 229 at 1 ¶ 2). This petition was never filed. (8 Tr. 1659: 2–15 (Loeffler)).

103. In paragraph 4, Nowak commented that Joy's MAI stock "cannot be remotely considered as a 'marketable security.' This should be pointed out to the Court." (PX 229 at 3 ¶ 4).

104. In paragraph 10, Nowak comments that subparagraphs (c) and (d) of paragraph 15 must be clarified to permit a contemplated "new business relationship with a Mr. Wilcox." Nowak suggests that "[t]his should be discussed with Arnold." (PX 229 at 4 ¶ 10).

105. Loeffler never discussed the new business relationship nor a clarification of 15(c) or (d) with Quittner. (8 Tr. 1665: 7–13 (Loeffler)).

106. In paragraph 11, Nowak writes that, with respect to subparagraphs (e) and (f) of paragraph 15 of the proposed First Supplemental Writ, "MAI, Ltd. is not a defendant and thus, it appears should not be bound by this restriction." (PX 229 at 4 ¶ 11).

107. Neither Nowak nor Loeffler ever sought a modification of ¶ 15(e) and (f). (8 Tr. 1668: 15–19 (Loeffler)).

108. On March 12, 1993, David Loeffler, on behalf of the Lees, filed the Lees' response to the proposed supplemental writ. (PX 82). In pertinent part, Loeffler requested "that paragraph 15(a) at pages 11 and 12 of the proposed Order be amended to explicitly provide that Miryoung Lee may allocate portions of *her salary* . . . to the payment of her attorneys' fees." (PX 82).

109. Loeffler never requested the Court to modify paragraph 15(d) nor to modify the proposed writ to allow Joy to sell her MAI stock to pay attorneys' fees. (PX 82, 101, 102, 285).

110. Loeffler knew at the time that he could seek a modification or clarification of the First Supplemental Writ at any time if a good reason existed. (8 Tr. 1674–75: 18–25, 1–5 (Loeffler)).

111. The Mantae defendants joined in Loeffler's response. (PX 231).

### B. *Entry and Service of the First Supplemental Writ*

112. On April 7, 1993, the Court entered the First Supplemental Writ of Attachment, Preliminary Injunction, and Appointment of a Receiver ("First Supplemental Writ"). (PX 100).

113. By its terms, the injunctive provisions of the Writ applied to "[t]he Mantae defendants, and any person or entity in active concert or participation with them who receives actual notice of this Order by personal service or otherwise." (PX 100, ¶ 15).

114. Paragraph 1 of the First Supplemental Writ defined "the Mantae defendants" as Mantae Company Limited (a/k/a MAI, Ltd., Puff Pac productions, Ltd., Best General Merchandise), Miryoung ("Joy") Lee, and Jong Sik ("Jerrold") Lee. (PX 100, ¶ 1).

115. The First Supplemental Writ was served upon MAI, Inc. and its bankruptcy attorneys, Stroock. (6 Tr. 1215–16: 1–25, 1–15 (Wilcox)).

116. Joy received and read the First Supplemental Writ on or about April 7, 1993. (2 Tr. 369: 11–13 (Lee)).

117. David Loeffler also received and read the First Supplemental Writ on or about April 7, 1993. (8 Tr. 1675–76: 6–25, 1–2 (Loeffler)).

## V. THE SECOND ALLEGED CONTEMPT: JOY LEE OPENS A NEW BANK ACCOUNT

118. Paragraph 15(b) of the First Supplemental Writ enjoined Joy Lee "from establishing any new bank, money market, brokerage, or other accounts created for the deposit and/or retention of assets." (PX 100, ¶ 15(b)).

119. In May 1993, after the First Supplemental Writ was entered, Joy closed her personal bank account and established a joint bank account with her nephew at a different bank. (2 Tr. 394–96: 24–25, 1–25, 1–2; 4 Tr. 735: 3–5 (Lee)).

120. Joy read subparagraph (b) of paragraph 15 of the Writ before she opened up the joint bank account with her nephew. (2 Tr. 396: 20–22 (Lee)).

121. Joy never notified anyone that she had opened up a bank account with her nephew, Danny Kim. (5 Tr. 910: 2–10 (Lee)).

## VI. THE THIRD ALLEGED CONTEMPT: VIOLATIONS OF SUBPARAGRAPHS (e) AND (f) OF PARAGRAPH 15 OF THE FIRST SUPPLEMENTAL WRIT BY DOING BUSINESS WITH THE LEE-CONTROLLED "FRONTS"

122. Paragraphs 15(e) and 15(f) of the First Supplemental Writ provide:

The Mantae defendants, and any person or entity in active concert or participation with them who receives actual notice of this Order by personal service or otherwise, are enjoined:

\*   \*   \*   \*   \*   \*

(e) from directing customers to pay anyone other than the Receiver for amounts due the Mantae defendants;

(f) from shipping any product directly, or indirectly, to customers in the United States without the permission and supervision of the Receiver, or its agent. \* \* \*

(PX 100 ¶ 15 (emphasis added)).

### A. Stroock and MAI See MJ and PTKSS as Fronts

123. MAI and its counsel, Stroock, apparently recognized that, because PTKSS and MJ Korea were Lee-controlled companies, the First Supplemental Writ precluded MAI from doing business with them. Thus, on April 19, 1993, Stroock, on behalf of MAI, filed a brief regarding the application of § 105 with the Court. In it, MAI argued that "irreparable harm will result to MAI . . . if MAI's access to its affiliated suppliers, which may include third-party defendants, is restricted as contemplated by this Court's previous orders." (PX 201 at 7).

124. MAI requested that the Court "lift the injunction to the extent it interferes with MAI's supply sources, prohibits any of the Mantae Defendants from sending goods to MAI, or prohibits MAI from paying for any of such purchases in the ordinary course of business." (PX 201 at 8–9).

### B. Wilcox Views MJ Korea and PTKSS as Affiliates of the Lees

125. Wilcox also recognized that, even though MAI, Ltd. had supposedly been "bankrupt" for months, it in fact continued as MAI's supplier. (PX 92; PX 93; PX 94; PX 279 at 5).

126. On April 26, 1993, at 9:42 a.m., Wilcox faxed a proposal to Joy for appointing an exclusive distributor to purchase MAI. (PX 283). The proposal was precipitated by MAI's current position in both the marketplace and the current financial condition of the company considering the "Paliafetto [sic]" lawsuit. (PX 283 at 2).

127. Under the proposal, the unnamed distributor would buy all of MAI's inventory and patents, would maintain a distribution facility in the United States, and could "pur-

chase goods from *MAI, Ltd.* per contract to be signed...." (PX 283 at 2) (emphasis added). In addition, the distributor would be assigned the worldwide rights to Grip Ball. (PX 283).

128. That same day, approximately an hour and a half later, Wilcox faxed an identical proposal to Joy. However, in the second version, Wilcox deleted "MAI, Ltd." in paragraph 1(D) and replaced it with "overseas." (PX 282 at 2; 8 Tr. 1638–39: 22–25, 1–11 (Wilcox)). Additionally, Wilcox filled in Vincent Jung as the new distributor under the proposal. (PX 282).

129. Wilcox testified that this proposal was never finalized or effectuated. (8 Tr. 1627–28: 16–14 (Wilcox)).

130. Wilcox's "M.S. Han" file (PX 151) contains a letter written to Wilcox by Yang Ok Han. She writes:

> I received a letter from Joy mentioning *your concerns about M.J Korea & our relationship between Jerry & my father & me.*
>
> As you know, I do not have much experience in business. I'm trying to learn as quick as I can and at the same time *to provide answers for Jerry* & my father isn't that easy.
>
> But I can tell you one thing that we are really planning to continue our relationship until we reach our goal successfully.

(PX 151 at 276) (emphasis added).

131. Documents contained in Wilcox's "M.S. Han" file (PX 151) contain a letter from Yang Ok Han indicating that it was faxed from MAI, Ltd. (PX 151 at W0000278–80). PX 114, 110, and other exhibits, purportedly sent by MJ Korea, also all indicate MAI, Ltd. as the sender in the facsimile traffic.

132. When Wilcox questioned Joy about this anomaly after the September depositions, Wilcox could not recall Joy giving any explanation. (2 Tr. 450–51: 17–25, 1–11 (Lee)). The respondents contend that this can be explained by the fact that MAI Ltd. sold its fax machines to MJ Korea, and that the configurations on the machines were not changed. (2 Tr. 452: 5–12 (Lee)). We find this explanation incredible.

133. Wilcox initially viewed Joy as a necessary link to MJ Korea. (6 Tr. 1237: 7–9 (Wilcox)). In a memorandum prepared by Wilcox related to a August 27th strategy meeting at Stroock's offices in Los Angeles (PX 137), Wilcox expressed the view that "without Joy's involvement no financing is available from M.J." (PX 137 at 3).

134. After Paliafito's counsel gave notice to MAI and Wilcox during the September 27, 1993 hearing in the Bankruptcy Court that MAI was running into the Court's injunction, Wilcox and MAI stopped sending money to or purchasing product from overseas suppliers, including MJ Korea or the Indonesian operation. (6 Tr. 1233–34: 2–25, 1–4 (Wilcox)).

## C. *MAI Inc.'s Lawyers Viewed MJ Korea and PTKSS as Affiliates of the Lees*

135. On April 27, 1993, this Court held a status hearing. (PX 103).

136. At the hearing, Quittner appeared for MAI and requested the Court to stay the action for 60 days to enable MAI to seek a § 105 injunction to expand the scope of the § 362 automatic stay to cover the Lees and the companies they control. (PX 102 at 32–33).

137. Quittner further argued that the § 105 relief was necessary because "Joy Lee has got to be able ... to design new product, to making sales, *to getting production done in Korea wherever else it is done to get the product over here....*" (PX 102 at 42–43) (emphasis added).

138. The Court granted Quittner's request and stayed the Wisconsin action for 60 days. (PX 103 at 2, ¶ 2).

139. Quittner never sought § 105 relief from the Bankruptcy Court during the 60 day stay period.

140. The Court never granted MAI's April 21st request to lift the injunction "to the extent it interfere[d] with MAI's supply sources, prohibite[d] any of the Mantae Defendants from sending goods to MAI, or prohibite[d] MAI from paying for any of such

purchases in the ordinary course of business." (PX 201 at 8–9; PX 103).

### D. *MAI Inc. Officials and Lawyers Meet with Bern Galvin*

141. In late April 1993, Bern Galvin was retained by the committee of unsecured creditors in the MAI bankruptcy to act as a business consultant. (5 Tr. 1045: 21–23 (Galvin)).

142. On May 24, 1993, Bern Galvin met with Wilcox, Quittner, Zirn, Stuart Koenig, counsel for the unsecured creditors committee, and an unnamed representative for the unsecured creditors at Stroock's offices. (PX 148; 5 Tr. 1047–48: 25, 1–12 (Galvin)). Quittner, Zirn, and Wilcox were running the meeting. (5 Tr. 1049–50: 22–25, 1–2 (Galvin)).

143. At this meeting, Galvin took notes (PX 148). (5 Tr. 1047: 19–24 (Galvin)). In his notes about MAI, Galvin wrote "main product made in Korea by related companies *by MAI, Ltd.*" (5 Tr. 1048–49: 24–25, 1–3 (Galvin); PX 148 (emphasis added)).

### E. *MAI's Frequent Calls to Korea*

144. After it relocated to West Memphis, Arkansas, MAI placed 56 telephone calls to the Korean telephone numbers 582–0551 and 582–0553 through July 2, 1993. (PX 156 at 1–7).

145. As set forth above, Joy identified the Korean telephone number 582–0551 as both Jerry's home telephone number and the number of MJ Korea. (FF ¶¶ 76–77). Additionally, on February 12, 1993, Jerry faxed a letter to Scatch Europe under MJ Korea letterhead listing MJ Korea's telephone numbers to be 582–0551 and 582–0553. (FF ¶; PX 42). On February 8, 1993, Jacqueline Jean faxed a letter (PX 41) to Scatch Europe under MAI, Ltd. letterhead listing MJ Korea's telephone numbers to be 582–0551 and 582–0553. (PX 42).

### F. *Joy Resigns from MAI, Inc.*

146. On May 28, 1993, Paliafito filed a motion to convert the MAI bankruptcy to Chapter 7 or, in the alternative, to appoint a chapter 11 trustee. (PX 108).

147. The same day, Joy resigned as president and director of MAI (PX 109; 2 Tr. 404: 8–10 (Lee)). One of the reasons for her resignation was so that MAI and its lawyers could go into the bankruptcy court to tell Judge Greenwald, in opposition to Paliafito's motion to convert, that Joy was no longer part of MAI management. (6 Tr. 1125: 9–17 (Wilcox)).

148. On May 28, 1993, Wilcox became the chief executive officer, president, and secretary of MAI (6 Tr. 1108: 6–12 (Wilcox)), although he never actually went on the payroll of MAI. (6 Tr. 1108: 17–19 (Wilcox)).

149. From then until December, Wilcox was in control of the management of MAI. (6 Tr. 1125–26: 25, 1–2 (Wilcox)).

150. After July 1993, MAI had only one employee—Joy Lee—on MAI's books and records. (6 Tr. 1125: 3–8 (Wilcox)).

### G. *Jerry Proposes Creation of an Agent or "Front" Company*

151. On June 2, 1993, Jerry Lee faxed a Korean language letter on MAI, Ltd. stationery. (PX 110). Paliafito presented evidence that pertinent portions of PX 110 are translated from Korean to English, as follows:

1. We open a STANDBY L/C for US $2,000,000 to M.J. USA BRANCH. M.J. USA finances a front company by getting a cash loan of US $2,000,000 from the Korea Exchange Bank, L.A. Branch. The front company buys all the MAI items in stock.

2. At the same time, we get the purchasing orders of minimum US $2,000,000 from K–Mart and TARGET and make deliveries as quickly as we can.... Then, we pay US $2,000,000 back to the Korea Exchange Bank, L.A. Branch with the money from the above mentioned sales.

\* \* \* \* \* \*

4. As such, if we recover US $12,000,000 (regular price) by selling MAI items in stock, i.e. worth US $12,000,000 adding various extras to them, then our business would be a successful one. The entire money earned in these sales may be spent in the U.S. (One exception, I have to use

about US $2,000,000 to take care of personal business.)

\* \* \* \* \* \*

6. M.J. Korea, Ltd. will transfer the STANDBY L/C of US $2,000,000 to M.J. USA Branch. And I will receive US $1,000,000 in advance to take care of my personal business. Therefore, M.J. USA will be taking over the entire items in stock for the total amount of US $3,000,000.

(PX 110).

152. Joy Lee claimed that the phrase "front company" in paragraph one was not a correct translation, but that the term should be "agent" company or "representative" company. (2 Tr. 418, 423: 5–6, 3–4 (Lee)).

153. While the dictionary definition for the contested term ("Dae Ri In Ho Sa") is "agent" or "representative," the term may also carry the connotation of a "front company," depending upon the context and the writer's intent. (3 Tr. 460–62: 10–25, 1–16, 7–25 (Interpreter Gras); PX 217).

154. The totality of the evidence, including the circumstances surrounding the transmission of PX 110 from Jerry to Joy, leads us to conclude that Jerry intended this term to mean the equivalent of a front company.

155. Joy testified, and the in-court translators agreed, that the term "personal business" in paragraphs 4 and 6 was not a correct translation. Instead, she testified that "personal problem" should be substituted for "personal business." (3 Tr. 468: 14–22 (Lee); PX 218; PX 219).

156. Joy testified that it was Jerry's plan, as indicated in PX 110, to purchase all of MAI's inventory at below market price. (3 Tr. 492–93: 14–25, 1–3 (Lee)).

## H. *The Appearance of ConPro and MJ USA Branch*

157. On June 8, 1993, Joy, on behalf of ConPro, Inc., signed two D/A Contract Notes for the purchase of $40,320 in Grip Footballs (PX 117) and $18,240 in Hit 'N Grip (PX 220). The D/A Contract Notes list ConPro's address as 706 Royal Avenue, Memphis, Tennessee. (PX 117; PX 220). The D/A Contract Notes indicate that they were faxed from MAI, Ltd. (PX 117; PX 220).

158. On June 8, 1993, Daniel Kim, who worked for both MAI and MJ Korea (2 Tr. 439: 11–20 (Lee)), sent a fax (PX 114) to Joy on MJ Korea letterhead. In it, Mr. Kim stated: *"President Lee has instructed me to tell you to arrange with DeBro & Lee not to send INVOICES to the Korea Exchange Bank from now forward."* (PX 114) (emphasis added).

159. "President Lee" referred to in PX 114 refers to Jerry. (2 Tr. 442: 13–16 (Lee)).

160. On an Approval of Establishment for Overseas Branch filed on June 9, 1993, MJ Korea established its "MJ USA Branch" at APAK Packaging, 706 Royal Avenue, Memphis, Tennessee. (PX 124).

161. Yang Ok Han was appointed branch manager of MJ USA branch. She traveled to the United States and met with Joy and banks. She also discussed purchasing Joy's MAI stock. (4 Tr. 745–46: 6–25, 1–7 (Lee)).

## I. *MAI Money was Sent Overseas*

162. On May 28, 1993 and August 3, 1993, MAI Inc. transferred funds in the amount of approximately $29,000 to PT Kartika Semesta, the Indonesian operation. (PX 176; 7 Tr. 1335: 12–17 (Wilcox)).

163. After April 7, 1993, MAI Inc. transferred funds in the approximate amount of $341,500 to MJ Korea. (7 Tr. 1335–36: 18–25, 1–19 (Wilcox)).

164. Based upon a 5% commission "credit" which MAI received from MJ Korea, Wilcox estimated that MJ Korea received another $270,000 from MAI's international customers for Grip Ball sales. (7 Tr. 1340–41: 9–25, 1–10 (Wilcox)).

165. In a 1993–1994 International Sales Forecast for Grip Toys contained in Wilcox's "Joy" file faxed to Wilcox on *August 12, 1993*, international sales for Grip Ball-related products was forecasted to be almost $2 million in 1993. (PX 150 at 484).

166. Wilcox put Joy in charge of international sales. (7 Tr. 1343: 2–4 (Wilcox)). Under the MAI system then in place, it was

entirely possible that Joy could have directed customers outside the United States to pay MJ Korea directly and Wilcox would not know anything about it. (7 Tr. 1343: 5–11 (Wilcox)).

## VII. THE FOURTH ALLEGED CONTEMPT: JOY LEE'S SALE OF MAI STOCK.

### A. The Respondents' Knowledge of the Court's Order

167. Soon after the First Supplemental Writ was entered, Joy Lee and David Loeffler each independently read paragraph 15(d), the subparagraph preventing her from changing her ownership interest in any entity involved in the "manufacture, exportation, importation, distribution or sale of the Grip Ball game." (PX 100; 3 Tr. 532: 18–20 (Lee); 8 Tr. 1675–76: 21–25, 1–2 (Loeffler)).

168. At the time of the First Supplemental Writ and thereafter, MAI was involved in the "importation, distribution or sale of the Grip Ball game" as described in subparagraph (d) of paragraph 15 of the First Supplemental Writ. (PX 32; 3 Tr. 532: 21–24 (Lee)); 6 Tr. 1218–19: 25, 1–5 (Wilcox).

169. By April 15, 1993, Stroock was looking into "issues of control of debtor [i.e. MAI Inc.] stock." (PX 70 at 34, entry 8).

170. Loeffler knew of Stroock's efforts. He was "sure" that, prior to the April 27th hearing before this Court, Stroock was looking into "the question of ownership and control of MAI stock." He also was "sure" that Stroock sent him memoranda on this issue. (9 Tr. 1808–09: 21–25, 1 (Loeffler)).

171. April 15, 1993 came and went without any compliance by the Lees or their enterprises with the requirement that they post $8 million with the receiver, and the respondents all knew this. (PX 102 at 4).

172. The respondents were on notice that the First Supplemental Writ provided that non-compliance could result in the entry of judgment. (PX 100, ¶ 17; PX 102 at 4). On April 19, 1993, they knew that Paliafito had moved for entry of judgment. (PX 102, 103).

173. On April 21, 1993, Joy faxed a letter (PX 235) to Quittner stating "I never want to see another 204 pages of opinion from California court. Now is the time to show that your Law Firm [Stroock] can bite Skadden and Springer's nonsense and Arnold will not put up with such nonsense." (PX 235).

174. According to Joy, nothing less than her and her family's ownership and control of MAI were at stake:

I am totally depending on your success. Remember *me and my family* put every possible efforts and sweat *into this company*. We just can not *give away*."

(PX 235 at 2 (emphasis added)).

175. On April 26, Joy faxed to Loeffler a copy of her memorandum to Quittner. (PX 235 at 1).

176. The same day Loeffler filed a motion to reconsider portions of the First Supplemental Writ. In it, Loeffler requested the Court to reconsider "portions of paragraphs 15(a) and paragraph 17" to permit the Lees "to spend current income not attached to compensate their defense attorneys on a pay-as-you-go basis." (PX 101 at 1 & 3).

177. Loeffler never requested the Court to modify subparagraph 15(d) nor to modify the First Supplemental Writ to allow Joy to sell her MAI stock, or any other asset, to pay attorneys' fees. (PX 101).

### B. The April 27 Status Conference

178. On April 27, the Court held a status hearing at which, among other things, Paliafito's counsel informed the Court that, once the Court entered judgment against the Lees, Paliafito intended to execute its judgment against the MAI stock owned by Joy. (PX 102 at 66–67).

179. At the hearing, Loeffler also reiterated his request that the Court modify ¶ 15(a) of the First Supplemental Writ to permit the Lees to pay their attorneys on a "pay as you go" basis. (PX 102 at 10 (lines 14–17), 59 (lines 20–24), 61 (lines 18–20), 71 (lines 10–13)).

180. Loeffler was silent on the question of whether Joy could sell her stock, and he made no mention, much less a request to modify, Paragraph 15(d) or any other provision to let Joy sell her stock, to pay attor-

neys' fees or for any other purpose. (PX 102).

181. On April 27, 1993, the Court issued a letter ruling reflecting its rulings made at the status hearing. The Court modified only paragraph 15(a), leaving the others intact and unchanged:

Third, the Court ordered that paragraph 15(à) of the First Supplemental Writ of Attachment, Preliminary Injunction, and Appointment of a Receiver filed April 7, 1993 be amended by replacing the language reading "provided however [sic] that such expense [sic] shall not be construed to include payment for attorneys' fees" with "provided, however, that such expenses shall be construed to include payment for necessary and reasonable attorneys' fees."

(PX 103 at 2 ¶ 3). The Court also stayed proceedings for 60 days, including consideration of Paliafito's motion for entry of judgment. (PX 103).

### C. Paliafito Moves to Oust the Lees from MAI

·182. On May 28, 1993, the same day that Paliafito filed its motion to convert the bankruptcy to Chapter 7 (Findings of Fact "FF" ¶ 148), Joy tendered her Stroock-drafted "resignation" and appointed Ray George sole director of MAI and Wilcox president and secretary. (PX 109; 2 Tr. 404: 5–10 (Lee)).

183. She also announced her intention to put her MAI stock in a voting trust to be voted by a third person. (PX 109). This also was Stroock's idea (2 Tr. 405: 5–7 (Lee)), and her promise to do so was included in a Stroock-drafted declaration filed with the Bankruptcy Court in opposition to Paliafito's motion to convert the MAI bankruptcy to Chapter 7. (PX 111). "On May 28, 1993 ... I also agreed to place my shares in a voting trust and grant an independent party the right to vote on all matters requiring shareholder approval other than the sale of substantially all of the Debtor's assets or the sale of stock." (PX 111).

### D. This Court's June 25 Status Conference

184. On June 25, 1993, the Court held a status conference. The Court notified the parties that it would defer ruling on Paliafito's motion for entry of judgment against the Mantae defendants for two weeks, that is, until July 9, 1993. (PX 133).

185. At no time during the status hearing did Loeffler or anyone else seek a modification of ¶ 15(d), (e), or (f) of the First Supplemental Writ. Nor did Loeffler seek any determination by the Court about whether Joy could sell her stock to pay her attorneys' fees. (PX 285).

186. On June 25, Loeffler "Fed–Ex'd" a letter to Joy reporting the results of the conference. The letter included reminders that the Court had deferred decision for two weeks on Paliafito's motion for judgment, a request for payment for services, and an enclosure of the Court's April 27th letter ruling. (PX 134).

### E. Joy States Her Intent to Sell Her MAI Stock

187. On June 26, 1993, the day she received Loeffler's June 25, 1993 letter, Joy expressed her intention to sell her MAI stock. (3 Tr. 532–33: 25, 1–3 (Lee); 8 Tr. 1694–95: 16–25, 1 (Loeffler)).

188. On June 28, 1993, Zirn, an associate at Stroock, prepared and circulated a memorandum regarding the "disposition of MAI stock" (PX 135) to Robert Wilcox, copies to Joy, Loeffler, and Katz:

Pursuant to our telephone conversation earlier today, I spoke to Herb regarding Joy's contemplated disposition of her shares in MAI, and any advise [sic] he may have rendered in connection therewith.

Herb advised me that he has not spoken with Joy regarding her plans to sell the stock. He merely informed her that he had been advised by David Loeffler that the Wisconsin attachment order had been modified to allow her to use her personal assets to pay for attorneys' fees.

(PX 135).

### F. The Respondents Knew Paliafito Would Object

189. Loeffler recognized that Paliafito "may well argue that 15D is the only control-

ling provision" and that ¶ 15(d) prohibited Joy from selling her stock. (8 Tr. 1698: 4–19 (Loeffler)).

190. Loeffler identified the risk to Joy that the stock sale could violate paragraph 15(d), but he advised her that she could proceed with the sale. (8 Tr. 1700: 6–13 (Loeffler)).

191. Loeffler justified his advice on the grounds that if he was wrong, and the Court determined that the sale did violate ¶ 15(d), *"what difference does it make because if it's covered by the writ, the deal's going to be no good anyway. But if it is not covered by the writ then you are free to sell it."* (8 Tr. 1699: 4–6 (Loeffler) (emphasis added)).

192. Loeffler discussed with Stroock the impact of the terms of the First Supplemental Writ with Stroock upon Joy's contemplated sale. Stroock thought Loeffler's reading was reasonable (8 Tr. 1702–03: 22–25, 1–4 (Loeffler)), but they discussed the likelihood that Paliafito would take the view that ¶ 15(d) precluded the sale. (8 Tr. 1703: 5–9 (Loeffler)).

### G. The Respondents Agree to Joy's Stock Sale

193. Before she sold her stock, Joy wanted to get the opinions from Loeffler and Victor George on the issue of whether she could sell it. (3 Tr. 534: 12–20 (Lee)).

194. Loeffler and Victor George told Joy that it would be okay for her to sell the MAI stock to pay attorneys' fees. (3 Tr. 538: 19–25 (Lee)).

195. Joy also recalled that she discussed with the attorneys at Stroock, either Katz or Zirn, whether it would be proper for Joy to sell her stock. (3 Tr. 541: 2–4 (Lee)).

196. Everybody Joy asked agreed that it would be okay for her to sell the stock. If everyone had not agreed, Joy probably would not have sold the MAI stock. (3 Tr. 539–540: 25, 1–5 (Lee)).

197. Wilcox knew that there was a "strong likelihood" that Paliafito would be concerned if the stock was sold. (6 Tr. 1248–49: 24–25, 1–4 (Wilcox)).

198. Loeffler never suggested to Joy that, in light of the fact that Loeffler knew the position Paliafito would take, that she should go into Court and ask the Court whether she could sell her stock. (8 Tr. 1698: 20–25 (Loeffler)).

199. In all of their discussions regarding the contemplated sale of stock, Loeffler, the attorneys at Stroock, and Victor George never expressed the view that it might be a good idea, so there was no uncertainty, first to ask the Court whether the sale would violate the First Supplemental Writ. (8 Tr. 1703: 10–17 (Loeffler)).

200. Even though they had the opportunity, the Lees and Loeffler chose not to seek a clarification from the Court before proceeding with the sale. (8 Tr. 1704–05: 24–25, 1 (Loeffler)).

### H. The Stock Sale Closes and the Lawyers Get Paid

201. On July 8, 1993, one day before the Court was to rule on Paliafito's motion for entry of judgment, Joy sold her MAI stock to Yang Ok Han. (3 Tr. 533: 4–7 (Lee); 3 Tr. 545: 2–14 (Lee); PX 136 at 4; DX 21). *See also Select,* 852 F.Supp. at 753.

202. The stated purpose of the sale of stock was to get money to pay Loeffler's and Victor George's fees. As a result of the sale, $110,000 was wired into Victor George's bank account from Korea. (3 Tr. 540: 6–12 (Lee)).

203. On July 20, 1993, Victor George sent a letter to Loeffler enclosing a check in the amount of $75,000 "representing monies alluded to [*sic*] in your retainer correspondence to Joy." (PX 243).

204. In early August 1993, while in Korea, Wilcox signed the stock certificate transferring shares from Joy to Yang Ok Han. (PX 136 at 4; 3 Tr. 545–46, 46: 25, 1–2, 19–21 (Lee); 6 Tr. 1259: 18–25 (Wilcox); DX 21).

205. On August 13, 1993, Mr. Wilcox told Mark Paliafito of the stock transfer, which is how Paliafito learned of it for the first time. (6 Tr. 1250: 11–14) (Wilcox); 9 Tr. 1848: 18–1849: 8 (M. Paliafito)).

## I. *Loeffler Denies He Received a Retainer*

206. On October 11, 1993, in response to service upon him of Paliafito's writ of execution requiring surrender of any "retainer" paid him by Joy, Loeffler sent a letter to Laura Lenzer, Deputy U.S. Marshal (DX 10) stating "that no property of Ms. Lee ... described as a '$50,000 retainer' was present [at his law firm] at that moment of 'seizure.'"

> What was present and was seized as of Friday afternoon was a positive credit balance in favor of Ms. Lee in the amount of approximately $9,000, a balance against which charges are made as work is performed.

(DX 10). Loeffler testified to this Court that Joy never paid him a retainer. (8 Tr. 1708: 1–3 (Loeffler)).

207. Contrary to Loeffler's assertions, Joy did pay him a retainer. On June 25, 1993, Loeffler sent Joy a letter (DX 22) requesting her to pay his firm a *retainer* of $50,000.

> But we must be paid on a *retainer* upfront. We must now have a *retainer of $50,000* payable forthwith. We will charge $200 per hour against that $50,000 for the fees and costs of appeal, should judgment be entered against you and Jerrold in two weeks; we will also charge $200 per hour against that $50,000 if the litigation proceeds at the trial level.

(DX 22 at 1–2) (emphasis added).

208. On July 20, 1993, Victor George sent a letter to Loeffler enclosing a check in the amount of $75,000 "representing monies alluded to in your *retainer* correspondence to Joy Lee." (PX 243) (emphasis added).

209. Loeffler contends that "in the usual economic and commercial discourse about legal fees, 'retainer' means a non-refundable payment which is 'sunk' regardless of what services are actually performed prospectively," and that Mrs. Lee's payment was actually an "advance" on work to be performed prospectively. (Objections to Paliafito's Proposed Findings of Fact and Conclusions of Law of the Lees and Loeffler at 7). He claims that he meant an "advance" when he referred to a "retainer" in his letter.

## J. *Paliafito Informs this Court of the Sale*

210. On August 12, 1993, Stroock, on behalf of MAI, filed with the Bankruptcy Court a Notice of Change of Ownership attaching the share certificate evidencing the transfer to Ms. Han from Joy. (PX 136).

211. On August 13, 1993, Paliafito brought the sale to the attention of the Court and alleged a contempt of the First Supplemental Writ. (PX 212).

212. After Paliafito brought the sale to the Court's attention, Wilcox discussed with Joy the issue of getting the stock back from Yang Ok Han because it "created more problems than anticipated". (6 Tr. 1275–76: 20–6 (Wilcox)).

213. Loeffler did research into whether the stock sale could be viewed as a fraudulent conveyance to avoid a judgment. (8 Tr. 1709: 8–11; 8 Tr. 1709–10: 22–25, 1 (Loeffler)).

214. Neither Loeffler nor Victor George ever offered to give Joy back the $110,000 to allow her to buy back the MAI stock. (8 Tr. 1727–28: 25, 1–8 (Loeffler)).

215. At the end of August, Joy met with Yang Ok Han on the topic of getting the stock back. (8 Tr. 1714: 18–22 (Loeffler)). They discussed Paliafito's counsel August 16th letter to Ms. Han (PX 204): notice to her of the contempt proceedings and the impropriety of the sale of the stock. (4 Tr. 751–53: 13–25, 1–25, 1–18 (Lee)).

216. Joy raised the possibility that the sale of stock might be a problem. Yang Ok Han wanted to find a way to get Joy out of trouble and still own the MAI stock. (4 Tr. 752–53: 20–25, 1–8 (Lee)).

## K. *This Court Enters Judgment*

217. On August 19, 1993, this Court issued its Decision and Order entering judgment *nunc pro tunc* to August 13, 1993 against the Lees and the Mantae defendants in the amount of $8 million.

## VIII. PALIAFITO FILES, AND SERVES, ITS CONTEMPT MOTION AND MEMORANDUM ON THE RESPONDENTS.

218. On October 29, 1993, Paliafito filed its contempt motion and memorandum with the Court and served copies upon the Lees and Loeffler.

## CONCLUSIONS OF LAW

### I. LEGAL STANDARD

■ 1. In order to establish civil contempt, a complaining party must establish that a court order was violated by clear and convincing evidence. *D. Patrick Inc. v. Ford Motor Co.*, 8 F.3d 455, 460 (7th Cir.1993); *Stotler & Co. v. Able*, 870 F.2d 1158, 1163 (7th Cir.1989) (citation omitted); *Shakman v. Democratic Organization of Cook Cty.*, 533 F.2d 344, 351 (7th Cir.1976), *cert. denied*, 429 U.S. 858, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976).

■ 2. To hold a party in civil contempt, "the district court 'must be able to point to a decree from the court which "sets forth in specific detail an unequivocal command" which the party in contempt violated.'" *Stotler*, 870 F.2d at 1163 (*quoting Ferrell v. Pierce*, 785 F.2d 1372, 1378 (7th Cir.1986)) (*quoting H.K. Porter Co. v. National Friction Products*, 568 F.2d 24, 27 (7th Cir. 1977)).

■ 3. A party can only be held in contempt for engaging in behavior "clearly prohibited by a court order 'within its four corners'" *D. Patrick*, 8 F.3d at 460 (quotation omitted). Any ambiguity or conflict in the First Supplemental Writ precludes a finding of contempt against the respondents. *Id.* at 460.

■ 4. However, what the injunction actually says—not what the parties think it ought to have said—controls subsequent proceedings in contempt. *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1432 (7th Cir.1985) (*citing Pasadena Board of Education v. Spangler*, 427 U.S. 424, 438–40, 96 S.Ct. 2697, 2705–06, 49 L.Ed.2d 599 (1976)), *cert. denied*, 475 U.S. 1147, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986).

■ 5. A party's reliance on a twisted or tortured construction of the Court's order, coupled with his failure to seek clarification from the Court before engaging in potentially contumacious conduct, can support a finding of willfulness. *United States v. Greyhound Corp.*, 508 F.2d 529, 532 (7th Cir. 1974).

6. The state of mind of a party to the underlying action is irrelevant in a civil contempt proceeding. *See, e.g., Commodity Futures Trading Comm'n v. Premex, Inc.*, 655 F.2d 779, 785 n. 11 (7th Cir.1981) ("[T]he fact that a prohibited act is done inadvertently does not preclude a contempt citation...."); *West Texas Utilities Co. v. NLRB*, 206 F.2d 442, 448 (D.C.Cir.1953) ("Adjudications for civil contempt to protect the benefits of a decree do not depend on the state of mind of the contemnors.") *cert. denied*, 346 U.S. 855, 74 S.Ct. 70, 98 L.Ed. 369 (1953); *NLRB v. Ralph Printing & Lithographing Co.*, 433 F.2d 1058, 1062 (8th Cir.1970) ("[C]ivil contempt ... is a sanction to enforce compliance with an order of the court and is not dependent on the state of mind of the respondent.") *cert. denied*, 401 U.S. 925, 91 S.Ct. 883, 27 L.Ed.2d 829 (1971); *NLRB v. Crown Laundry & Dry Cleaners*, 437 F.2d 290, 293 (5th Cir.1971) ("The crucial issue in civil contempt proceedings ... is not the employers state of mind but simply whether the Court's order was in fact violated.")

7. According to the Supreme Court, "[s]ince the purpose [of civil contempt] is remedial, it matters not with what intent the defendant did the prohibited act.... An act does not cease to be a violation of the law and of a decree merely because it may have been done innocently." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949).[3]

■ 8. Thus, "[a] district court ordinarily does not have to find that the violation

---

3. While this Court has previously stated in dicta that a party's conduct must be "deliberate and intentional" in order to support a finding of contempt, *Rototron Corp. v. Lake Shore Burial Vault*, 553 F.Supp. 691, 700 (E.D.Wis.1982), we conclude that a party need not intentionally violate the Court's order to be found in contempt.

was 'willful' to find a party in civil contempt ... and it may find a party in civil contempt if he has not been 'reasonably diligent and energetic in attempting to accomplish what was ordered.'" *Stotler,* 870 F.2d at 1163 (*quoting American Fletcher Mortgage v. Bass,* 688 F.2d 513, 517 (7th Cir.1982)). Moreover, a civil contempt may be established even though the failure to comply with the Court's order was unintentional or done with good intentions. *See Perry v. O'Donnell,* 759 F.2d 702, 705 (9th Cir.1985) (*citing CFTC v. Premex, Inc.,* 655 F.2d 779, 784 (7th Cir.1981)).

9. Because a Court's issuance of an order may put the parties to that action on notice that their past acts have been wrongful, "'[n]o concept of basic fairness is violated by requiring a person in this position to be more than normally careful in his [or her] future conduct.'" *Greyhound,* 508 F.2d at 532–33 (citation omitted). A contemnor who fails to seek the Court's clarification or modification of the Court's order before engaging in potentially contumacious conduct "ha[s] only itself to blame for its ... predicament." *Scandia Down Corp.,* 772 F.2d at 1432.

10. Under certain circumstances, a district court may find a nonparty to the underlying action in contempt of court. *See Stotler,* 870 F.2d at 1164. According to the Federal Rules of Civil Procedure, "when obedience to an order may be lawfully enforced against a person who is not a party, he is liable to the same process for enforcing obedience to the order as if he were a party." Fed.R.Civ.Proc. 71.

11. The issue of whether and when a court's order can be enforced against a nonparty was perhaps best explained by Judge Learned Hand in the case *Alemite Manufacturing Corp. v. Staff,* 42 F.2d 832 (2d Cir. 1930):

[N]o court can make a decree which will bind any one but a party; ... it cannot lawfully enjoin the world at large, no matter how broadly it words its decree.... Thus, the only occasion when a person not a party may be punished, is when he has helped bring about, not merely what the decree has forbidden ... but what it has the power to forbid, an act of a party.

This means the respondent must either abet the defendant or be legally identified with him.

*Id.* at 833 (emphasis added).

12. Federal Rule of Civil Procedure 65(d) "is a codification of [this] common-law rule allowing a non-party to be held in contempt for violating the terms of an injunction when a non-party is legally identified with the defendant or when the non-party aids or abets a violation of an injunction." *State of Illinois v. United States Dept. of Health & Human Ser.,* 772 F.2d 329, 332 (7th Cir.1985). *See also Herrlein v. Kanakis,* 526 F.2d 252, 253–54 (7th Cir.1975).

13. Rule 65(d) provides, in pertinent part, that an injunction "is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and *upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.*" Fed.R.Civ.P. 65(d) (emphasis added).

14. Thus, nonparties with notice of the Court's order who are in active concert or participation with a party or who aid and abet a party's violation of the order may be held liable for contempt. *United States v. Board of Education of the City of Chicago,* 11 F.3d 668, 673 (7th Cir.1993).

15. According to the Seventh Circuit:

The most well-accepted formulation of the standard of proof for aiding and abetting is that expressed by Judge Learned Hand in *United States v. Peoni,* 100 F.2d 401 (2d Cir.1938). He wrote that the prosecution must show that the defendant 'in some sort associate[d] himself with the venture, that he participate[d] in it as in something he wishe[d] to bring about, (and) that he [sought] by his action to make it succeed.' *Id.* at 402.

*United States v. Beck,* 615 F.2d 441, 448 (7th Cir.1980). *See also United States v. Hooks,* 848 F.2d 785, 789 (7th Cir.1988) (citations omitted).

16. The standard for proof of aiding and abetting thus has two prongs, "association and participation; that is, intent plus some overt act designed to aid in the success of the

venture". *Beck,* 615 F.2d at 448–49. *See also United States ex rel. Vuitton et Fils S.A. v. Karen Bags,* 602 F.Supp. 1052, 1064 (S.D.N.Y.) (applying standard in context of criminal contempt) *aff'd sub nom.* 780 F.2d 179 (2d Cir.1985) *rev'd on other grounds sub nom.* 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987).

■ 17. Determining whether a nonparty respondent has actively aided a party in violating the Court's order necessarily requires some inquiry into a nonparty respondent's state of mind. Unlike the inquiry required for parties to the underlying action, it is not enough that the actions of nonparties simply violated the Court's order.

18. Thus, in evaluating whether the Lees are in contempt of court, our task is simple. We need only examine the text of the Court's order, determine whether the party had notice of the order, and determine whether the party acted in violation of the order. Similarly, in order to determine whether Mr. Loeffler is liable for contempt, we must examine the text of the Court's order, determine whether he had actual notice of the order, and determine whether he has acted in concert with, or aided and abetted, the Lees in violating the Court's order.

## II. THE ALLEGED CONTEMPTS

### A. Joy Lee's Document Shredding

■ 19. On January 24, 1992, this Court issued a Protective Order which set forth in specific detail an unequivocal command: "[T]he parties shall not destroy or dispense with documents until further order of the Court."

20. As set forth above, Joy Lee had actual knowledge of the Court's January 24, 1992 Order, including personal possession of the Order. (FF ¶ 90.)

21. On and after February 24, 1993, Joy Lee knowingly violated the Court's January 24, 1992 Order by expressly allowing and authorizing the establishment of a procedure by which MAI documents were shredded. (FF ¶¶ 91–95) Under the procedure allowed and authorized by Joy Lee, MAI documents were shredded and destroyed, although there is no record or other way to determine precisely which documents were destroyed.

22. Accordingly, the Court finds, by clear and convincing evidence, that Joy Lee violated this Court's January 24, 1992 Protective Order and is in contempt thereof.

### B. Joy Lee's Bank Account

■ 23. Paragraph 15(b) of the First Supplemental Writ set forth in specific detail an unequivocal command: Joy Lee was prohibited "from establishing any new bank, money market, brokerage, or other accounts created for the deposit and/or retention of assets."

24. Joy Lee had actual knowledge of the terms of the First Supplemental Writ. (FF ¶ 116, 120.)

25. Joy Lee violated Paragraph 15(d) of the First Supplemental Writ by opening a joint bank account with her nephew in May 1993. (FF ¶ 119.)

26. Accordingly, the Court finds, by clear and convincing evidence, that Joy Lee violated Paragraph 15(d) of the First Supplemental Writ and is in contempt thereof.

### C. The Lees' Violations of Paragraphs 15(e) and 15(f)

27. The First Supplemental Writ set forth in specific detail the following unequivocal commands:

The Mantae defendants [defined to include Jerry and Joy Lee, among others] and any person or entity in active concert or participation with them who receives actual notice of this Order by personal service or otherwise are hereby enjoined:

\* \* \* \* \* \*

(e) from directing customers to pay anyone other than the Receiver for amounts due the Mantae defendants; [and]

(f) from shipping any product directly, or indirectly, to customers in the United States without the permission and supervision of the Receiver, or its agent.

First Supplemental Writ ¶ 15(e)–(f).

28. We conclude that the language of these paragraphs is unambiguous. We also

conclude that the Lees and their counsel had actual knowledge of the terms of the First Supplemental Writ. (FF ¶ 116, 117.)

29. Therefore, the only matter remaining for discussion is whether the actions of the Lees violated the "four corners" of this provision of the First Supplemental Writ.

30. Paliafito contends that the Lees violated Paragraphs 15(e) and (f) through the use of front companies: MJ Korea and PTKSS in Indonesia. Specifically, Paliafito argues that the Lees violated Paragraph 15(e) of the First Supplemental Writ by directing MAI and other international purchasers of Grip Toy products to pay funds to MJ Korea and PTKSS—"fronts" for the Mantae defendants—instead of to the Receiver, for amounts due the Mantae defendants. It further claims that the Lees violated Paragraph 15(f) by shipping, and procuring the shipment of, product by their "front companies" to "customers" in the United States—namely, to MAI, Inc.—without the supervision of the Receiver.

31. The Lees dispute these claims. They contend that Paliafito has failed to prove by clear and convincing evidence that MJ Korea and PTKSS are fronts or alter egos of the Lees, as individuals, or of MAI or MAI, Ltd. Therefore, they argue, because these companies are independent, the transactions were not prohibited by the First Supplemental Writ. In addition, they argue that Paliafito has failed to introduce clear and convincing evidence of shipments by MJ Korea and PTKSS to MAI, Inc. or its customers.

32. Soon after the Court concluded the evidentiary hearing on Paliafito's motion for a writ of attachment in April 1992, the Lees, pursuant to a plan drafted by their lawyers, began creating new corporate shells to "insulate" from Paliafito and other creditors the more than $30 million in assets in the Lees' corporate empire. (FF ¶¶ 10–37.)

33. Under the plan, the Lees created the entity "Mi Jong Industries." To conceal its affiliation with MAI, employees at MAI used different names when conducting business on behalf of Mi Jong. (FF ¶¶ 10–37; 54–74.)

34. On December 26, 1992, approximately three weeks after this Court's December 1, 1992 Decision and Order, the Lees' primary Korean operation, MAI, Ltd., purportedly went into "bankruptcy" in Korea. (FF ¶ 49.) Although Korean law would call for recordation of such a bankruptcy on MAI, Ltd.'s company registry on file with the Korean district court, no such recordation appears. (FF ¶ 52.)

35. Three days later, on December 29, 1992, MJ Korea company was incorporated, supposedly by former employees of MAI, Ltd. (FF ¶¶ 55, 56). Thereafter, Jerrold Lee (a) conducted business on behalf of both MAI, Ltd. (even though it had purportedly ceased doing business) and MJ Korea using the same telephone number, (FF ¶¶ 58–62; 67–70), (b) had customers switch letters of credit from MAI, Ltd. to MJ Korea (FF ¶ 60), and (c) faxed documents using MAI, Ltd.'s fax machine (FF ¶ 131). These findings, taken in conjunction with the entirety of the record evidence, compels the conclusion that MJ Korea was a "front" for the Lees.

36. Despite the fact that the Han family purchased 85 percent of MJ Korea's stock on April 23, 1993 (FF ¶ 75), Jerry Lee continued to exercise control over the affairs of the company, at least through the summer of 1993. (FF ¶ 79.)

37. Pursuant to the Lee's asset-insulation plan, in the summer of 1992 the Lees and their family members also created the Indonesian operation, PTKSS, in order to move their principal manufacturing operations from Korea to Indonesia. (FF ¶ 19–27). Paliafito has produced considerable evidence that the Lees did in fact control PTKSS including: (a) the fact that MAI, Inc. provided the start-up money for the company (FF ¶ 21); (b) that PTKSS was jointly owned by MAI and Jerry Lee's brother (FF ¶ 24); (c) various references by MAI Inc. and others to having control of its manufacturing in Indonesia (FF ¶¶ 35, 37); and (d) the attempt by MAI to modify this Court's injunction to ensure MAI's access to its "affiliated suppliers" (PX 201 at 7). We conclude that Paliafito carried its burden of producing clear and convincing evidence that the Lees or MAI, or MAI, Ltd., control PTKSS, the Indonesian toy producer.

38. Paragraph 15(e) prohibits the Lees and those acting in concert with them from directing any customer to pay any money owed to the Mantae defendants to anyone other than the Receiver.

39. Paliafito alleges that the Lees violated this provision of the First Supplemental Writ by directing MAI Inc. and other international purchasers of Grip Toy products to pay funds to MJ Korea and PTKSS instead of to the Receiver.

40. MAI Inc. was a customer of MAI Ltd., a Mantae defendant.

41. MJ Korea and PTKSS were fronts for MAI Ltd. and the Lees. Thus, any monies paid by MAI Inc. to those entities for Grip Ball products were in actuality "amounts owed" to Mantae defendants (MAI Ltd. and the Lees).

42. The Court is convinced that during most of the relevant time period, the Lees were in control of MJ Korea and PTKSS and therefore "directed" customers to pay amounts due to Mantae defendants to persons other than the Receiver. Therefore, they violated this provision of the First Supplemental Writ.

43. Specifically, Paliafito alleges that the Lees violated paragraph (e) by causing MAI Inc. to transfer a total of $341,000 to MJ Korea between April 14, 1993 and August 27, 1993.[4] (PX 176.)

44. Paliafito further alleges that on May 28, 1993, MAI transferred $6,125 to PTKSS, and on August 3, 1993 MAI transferred another $22,920 to PTKSS in violation of the First Supplemental Writ.

45. Paliafito further contends that after April 7, 1993, MJ Korea received approximately $270,000 from Grip Ball sales around the world. This figure is based on Wilcox's estimation that MAI Inc. received between $12,000 and $14,000 in commissions from the international sales of Grip Toy products and MAI Inc.'s five percent commission on such sales. (7 Tr. 1340–41 (Wilcox).)

46. Finally, Paliafito contends that "it is reasonable to conclude that Paliafito suffered damages representing some portion of the $2 million in international sales which Joy projected for 1993." (Paliafito Proposed Finding of Fact ¶ 292.)

47. For the foregoing reasons, the Court concludes that the Lees have violated subparagraph (e) by directing customers to pay monies owed to the Mantae defendants to persons other than the Receiver and are therefore in contempt of this Court's Writ.

48. Paragraph 15(f) of the First Supplemental Writ prohibits the Mantae defendants, including MAI Ltd., the Lees, and those in active concert and participation with them, from shipping any product to customers in the United States without the permission and supervision of the Receiver.

49. MJ Korea and PTKSS were in active concert with the Lees and therefore were thus barred from shipping products to American customers without permission from the Receivers.

50. Paliafito alleges that MJ Korea and PTKSS, as MAI Ltd. fronts, shipped product to MAI Inc.—a customer of MAI Ltd.—in the United States in violation of the First Supplemental Writ.

---

4. We are aware that MAI's payments to MJ Korea passed through U.S. clearing banks, presumably pursuant to the documents upon acceptance or D/A process. The D/A process works as follows: In order to finance the production of goods, the manufacturer borrows money from a Korean bank. That money is used to manufacture goods which are to be shipped to the United States under a bill of lading. Upon receipt of the documents, including the bill of lading proving shipment, the purchaser executes a bill of exchange to a United States collecting bank. This bill of exchange is dated the same as the bill of lading and is typically due 60 to 120 days after shipment of the goods. "Documents upon ac-

ceptance" refers to the fact that the receiving documents, including the bill of exchange payable to the U.S. collecting bank by the purchaser, are executed when the goods are shipped to the United States. Sixty to 120 days after the bill of lading date, the purchaser should pay the bill of exchange to the collecting bank who then pays the manufacturer's bank, clearing its debt. (7 Tr. 1452: 17–22 et seq; 1550: 7 et seq. (Wilcox)).

However, this does not change the analysis. The money paid was effectively owed to a Mantae defendant—MAI Ltd.—and should have been paid to the Receiver rather than to MJ Korea.

51. It appears from the payments made by MAI Inc. to MJ Korea and PTKSS that, in all likelihood, product was in fact shipped to MAI Inc. However, Paliafito has not pointed to any testimonial or documentary evidence in the record to support this claim. In addition, the fact that the Grip Toy products were normally purchased through the documents on acceptance or D/A process raises the possibility that the product was shipped well prior to the payment and potentially in advance of the issuance of the First Supplemental Writ.

52. We conclude that Paliafito has not established a violation of this provision by clear and convincing evidence. Therefore, we cannot find the Lees in contempt of this provision of the First Supplemental Writ.

### D. *The Stock Sale*

53. On July 8, 1993, one day before this Court was scheduled to rule on Paliafito's motion for entry of judgment against the Lees, Joy Lee sold her stock in MAI, Inc. to Yang Ok Han. (FF ¶ 201).

54. Joy Lee sought out, and obtained, David Loeffler's approval before she sold her shares. (FF ¶¶ 193–194.)

55. Paliafito alleges that this sale is a violation of the First Supplemental Writ, and that the Joy Lees should be found in contempt of Court for violating the Writ and Loeffler should be found in contempt for aiding and abetting this violation.

56. The Writ provided, in pertinent part:

The Mantae defendants, [defined to include Joy Lee] and any person or entity in active concert or participation with them who receives actual notice of this Order by personal service or otherwise are hereby enjoined:

(a) from selling or otherwise transferring any properties, inventories, accounts receivable, bank accounts, marketable securities, currency, certificates of deposits, checks or other negotiable instruments, or other assets they own or which they claim to own ... except to pay reasonable living expenses, provided however that such expense shall not be construed to include payment for attorneys' fees.

\* \* \* \* \* \*

(d) from ... transferring ownership interests in, any of the corporations affiliated in any way with the manufacture, exportation, importation, distribution, or sale of the Grip Ball Game, including, but not limited to, Mantae Company Limited, Best General Merchandise, Inc., MAI, Ltd., Best International Corp., Grip Toys, Inc., Mantae of California, and Puff Pac Production, Ltd.

(First Supplemental Writ at ¶ 15(a), (d)).

57. The Lees and their counsel, Loeffler, had actual knowledge of the terms of the First Supplemental Writ. (FF ¶¶ 116, 117).

58. The Lees and Loeffler both knew that MAI, Inc. was affiliated with the importation, distribution, and sale of the Grip Ball Game, and therefore had notice that paragraph 15(d) prohibited the sale or transfer of MAI Inc. stock.

59. The original language of the First Supplemental Writ is clear and unambiguous.

60. However, the Court amended this language on April 27, 1993.

61. At a status conference held before this Court on that same date, Mr. Loeffler requested that a "portion of the Order be amended to allow the Lees to pay lawyers if the litigation continues in this court on a pay-as-you-go basis from assets that are not presently under attachment." (Transcript of April 27, 1993 Proceedings at 59:20–24.)

62. In response, the Court stated that "I'm going to ... reconsider the first supplemental writ of attachment insofar as it affects attorneys' fees, and I'm going to relieve Mr. Loeffler from the interpretation of that portion of the writ which would prohibit the payment of unattached assets for attorneys' fees...." (Transcripts of April 27, 1993 Proceedings at 74:7–13).

63. The Court memorialized this ruling in a letter dated April 27, 1993:

*Third,* the Court ordered that paragraph 15(a) of the First Supplemental Writ of Attachment ... be amended by replacing the language reading "provided however

[sic] that such expense [sic] shall not be construed to include payment for attorneys' fees" with "provided, however, that such expenses shall be construed to include payment for necessary and reasonable attorneys' fees."

64. The Lees and Loeffler claim that the text of the First Supplemental Writ as amended, read in light of the Court's remarks, could be reasonably interpreted to permit the sale of Joy Lee's MAI, Inc. stock—her personal "asset" or personal "property"—for the limited purpose of paying reasonable attorneys' fees. They contend that it is reasonable to read the constraints of the First Supplemental Writ as amended on April 27, 1993, to provide in effect that reasonable living expenses which are outside the First Supplemental Writ shall be construed to include payment for necessary and reasonable attorneys' fees, and as *not* including the implied limitation, "but only if financed out of current income from MAI, Inc. or other sources of current income."

65. Paliafito argues that this interpretation of the First Supplemental Writ and its amendment is unreasonable. It argues that the Lees' and Loeffler's interpretation is contrary to the language of the Court's orders and the purpose behind them, and that subparagraph (d) exists independently of subparagraph (a) of the First Supplemental Writ.

66. According to Paliafito, subparagraph (d) was put in place to prevent the Lees from manipulating "corporate shells" to hide assets. It claims that Loeffler's argument before the Court at the hearing focused only on modifying subparagraph (a) to allow the payment of attorneys' fees from "current income," and that the prohibition on transferring ownership interests in Grip Toy-related companies—including MAI Inc.—was still in place after the amendment.

67. While we conclude that Paliafito's interpretation of the First Supplemental Writ and its amendments is clearly the most reasonable, as well as the most consistent with the Court's intent, we cannot conclude that our Order as amended was clear and unambiguous.

68. Thus, we feel compelled to conclude that neither Loeffler nor Joy Lee are in contempt of this order. *See D. Patrick,* 8 F.3d at 462 ("[A]mbiguity precludes a finding of contempt."). We need not reach the issue of whether the conduct of Joy Lee violated the Writ or whether Loeffler aided and abetted such a violation. Therefore, we conclude that Joy Lee's sale of her MAI stock to Yang Ok Han, on advice from Loeffler, was not a civil contempt by Lees or Loeffler because the text of the writ, as amended on Loeffler's motion on behalf of the Lees, was ambiguous.

69. This conclusion should not be mistaken for the Court's approval of the actions of Ms. Lee or Mr. Loeffler in selling Ms. Lee's MAI Inc. stock. It is the opinion of the Court that both parties escape liability for contempt only based on this Court's error in failing to unambiguously express its intention in its amendment to the First Supplemental Writ. Joy Lee and David Loeffler were aware of the possibility that they were violating the spirit, if not the letter, of the Court's order. Aware of the risk that the sale might violate ¶ 15(d), Loeffler could have made a telephone call to Paliafito before proceeding with the sale. The parties then could have had a ten-minute telephone conference with the Court to clarify the Order. Instead, Loeffler and Joy Lee chose to proceed with the sale, without first seeking clarification from the Court, and with the belief that, if they were wrong, the "only" risk they faced would be that the Court would undo the transaction. (FF ¶ 191).

### III. *SANCTIONS*

■ 70. The Supreme Court has explained the purpose of sanctions in a civil contempt proceeding as follows:

> Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained.

*United States v. United Mine Workers of America,* 330 U.S. 258, 303–04, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947).

■ 71. Where—as is the case here—compensation is intended, a fine may be im-

posed payable to the complainant.[5] *See Connolly v. J.T. Ventures,* 851 F.2d 930, 932 (7th Cir.1988) (citations omitted).

72. In assessing a civil fine, a court should " 'insure full compensation to the party injured.' " *Id.* (*quoting Leman v. Krentler–Arnold Hinge Last Co.,* 284 U.S. 448, 52 S.Ct. 238, 76 L.Ed. 389 (1932)).

73. Under Seventh Circuit precedent, the plaintiff must prove its damages as a necessary element of a civil contempt proceeding. *Shakman,* 533 at 349; *Hecht v. Don Mowry Flexo Parts, Inc.,* 111 F.R.D. 6, 9 (N.D.Ill.1986).

74. However, unlike the existence of a contempt of court, damages need not be proved by clear and convincing evidence. *See Graves v. Kemsco Group, Inc.,* 864 F.2d 754, 755 (Fed.Cir.1988) (applying Seventh Circuit law and citing *Shakman,* 533 F.2d at 351).

75. Nevertheless, "[d]amages must not be speculative or probable and they must be proved with a reasonable degree of certainty." *Classic Bowl, Inc. v. AMF Pinspotters, Inc.,* 403 F.2d 463, 467 (7th Cir.1968).

76. Where the aggrieved party's injury " 'is of such a nature as to preclude the ascertainment of the amount of damages with certainty . . . it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result [may] be approximate.' " *Howard Johnson Co. v. Khimani,* 892 F.2d 1512, 1520 (11th Cir.1990) (*quoting Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 250–51, 75 L.Ed. 544 (1931)) (affirming district court's assessment of civil contempt fine in the amount of contemnor's profits plus 1.5 times the royalties that should have been paid by (infringing restaurateur)).

77. Thus, "[w]hile it is true that the plaintiff[ ] need not prove [its] damages to a math-

ematical certainty, neither can [it] rely on mere speculation or conjecture." *Harbor House Condominium Association v. Massachusetts Bay Insurance Co.,* 915 F.2d 316, 319 (7th Cir.1990) (*citing S.C. Johnson & Son, Inc. v. Louisville R. Co.,* 695 F.2d 253, 261 (7th Cir.1982)).

78. A contemnor's profits may be a proper measure of damages for civil contempt. *Connolly,* 851 F.2d at 934. Total receipts obtained through the violation of an injunction may also provide the measure for a civil contempt fine. *See Maruzen Int'l Co. Ltd. v. Bridgeport Merchandise Inc.,* 770 F.Supp. 155, 160 (S.D.N.Y.1991) (exclusive distributor who obtained injunction against infringer entitled to civil contempt fine in amount of total receipts obtained by contemnor).

79. The complainant may also recover attorneys' fees and expenses incurred in prosecuting the contempt. *Connolly,* 851 F.2d at 935 (attorneys' fees); *Premex, Inc.,* 655 F.2d at 785 ("[A]n award of expenses and fees in civil contempt proceedings is proper and is independent of any award of compensatory damages.") (citations omitted). a) It is impossible to determine the amount of damages suffered by Paliafito as a result of Joy Lee's violations of paragraph 15(b) of the First Supplemental Writ and the January 24, 1992 Protective Order.

80. However, as set forth in the Court's findings of fact and as set forth above (see II C.), the Court concludes that, by reason of the violation of ¶ 15(e) of the First Supplemental Writ, Paliafito has suffered damages in the amount of $370,540 consisting of: (a) $341,500, the amount of MAI funds sent to or for the benefit of MJ Korea during the spring and summer of 1993 (FF ¶ 163); plus (b) $29,045, the amount of MAI funds sent to or for the benefit of PT

---

5. The Lees and Loeffler have submitted a "Motion to Dismiss Portions of Paliafito's October 29, 1993 Civil Contempt Proceeding" arguing that a recent Supreme Court case, *United Mine Workers v. Bagwell,* —— U.S. ——, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994), "has worked a sea change in the posture of this case." We disagree. The

holding of *Bagwell* is that a flat, unconditional fine that is *not compensatory* is a criminal contempt. *Bagwell* does not make this sanction a criminal contempt because it is for a determinate sum. The sanction involved in this case is purely compensatory.

Kartika Semesta, the Lees' Indonesian operation (FF ¶ 162).

82. We conclude that these transfers to Lee-controlled fronts caused Paliafito to suffer actual damages in these amounts. This money, had it not been transferred overseas, would have been attached for Paliafito's benefit and would have been applied toward satisfying its judgment against the Lees.

83. However, we conclude that Paliafito's request for $270,000 and "some portion" of $2 million, both representing money MJ Korea received from MAI's international customers, is too speculative and will thus be disallowed.

84. We also conclude that Paliafito is entitled to recover its reasonable attorneys' fees incurred in bringing this action. Because this is an equitable proceeding, the "American Rule"—that the prevailing party does not get attorneys' fees, *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247–262, 95 S.Ct. 1612, 1616–1624, 44 L.Ed.2d 141 (1975)—does not apply. This is not an ordinary action where the prevailing party is attempting to recover its fees. The purpose of this sanction is to make the aggrieved party whole. The costs Paliafito has incurred to enforce this Court's orders to its benefit are an appropriate measure of the remedy.

85. Therefore, the Court hereby levies a fine against the Lees in the amount of $370,-540 for violations of Paragraph 15(e) of the First Supplemental Writ. In addition, the Court orders that the Lees shall be held liable for that portion of Paliafito's attorneys' fees, costs of investigation, and costs of the contempt hearing attributable to their violations of the Court's orders.

85. Within thirty (30) days of the date of this order, Paliafito shall submit a fee application and bill of costs subject to the approval of the Court to determine this additional amount. The Lees will have twenty-one (21) days to object to Paliafito's bill of costs.

86. As discussed in this Court's previous decision entering judgment in the amount of $8 million against the Mantae defendants, *Select Creations, Inc. v. Paliafito America, Inc.*, 830 F.Supp. at 1230, before a

court may enter a default judgment against a recalcitrant defendant, there must be some finding of contumacious conduct, dilatory tactics, or the failure of less drastic sanctions.

87. Additionally, a court must be guided by norms of proportionality to insure that the default sanction is commensurate with the circumstances. The Seventh Circuit recently elaborated:

> Since sanctions should be proportionate to wrongdoing, the district judge should compare the size of the default judgment, discounted by the probability of collection, with the gravity of the defendant's procedural lapses or other misconduct, in deciding whether to enter such a judgment.

*Philips Medical Sys. Int'l, B.V. v. Bruetman*, 8 F.3d 600, 602–03 (7th Cir.1993), *reh'g. denied*, Jan. 10, 1994.

89. Applying the above standards for entry of a default judgment, the Court concludes that the Lees' willful violations of ¶¶ 15(b) and (e) of the First Supplemental Writ, and Joy Lee's willful violation of the January 24, 1992 Protective Order, each constitute separate, independent, and additional grounds warranting entry of a default judgment against the Lees and their companies in the amount of $8 million.

90. The Court concludes that the above contempts are part and parcel of the Lees' deliberate and calculated scheme to evade this Court's orders to the grave prejudice of Paliafito. From the very outset, the Lees have used delay to place their assets out of the reach of the Court and Paliafito. During the pendency of Paliafito's motion for a writ of attachment, the Lees represented that they were not secreting assets and would honor any order which the Court might enter on Paliafito's motion. Meanwhile, the Lees embarked on a course to "insulate" themselves from liability by secretly creating new corporate entities and placing their assets under the control of corporations located outside the United States.

91. The latest actions—(a) the use of front companies to conduct business in contravention of the First Supplemental Writ, (b) the sale of stock to thwart Paliafito's

ability to collect assets and to take control of MAI and oust Joy Lee, (c) the undisclosed establishment of a bank account, and (d) the shredding of documents—are a continuation of the Lees' contumacious scheme to evade this Court's orders.

92. Accordingly, the Court concludes that the Lees' violations of the First Supplemental Writ, and Joy Lee's willful violation of the January 24, 1992 Protective Order each provide separate, independent, and additional bases for the entry of judgment against the Mantae defendants, jointly and severally, in the amount of $8 million.

## SUMMARY

For the foregoing reasons, the Court finds Joy Lee in contempt of court for violating this Court's January 24, 1992 Protective Order, and for violating paragraph 15(b) of this Court's First Supplemental Writ. The Court further finds both Joy and Jerry Lee in contempt of court for violating paragraph 15(e) of this Court's First Supplemental Writ. The Court declines to find Joy Lee in contempt for violating paragraph 15(d) of the First Supplemental Writ and declines to find Joy and Jerry Lee in contempt for violating paragraph 15(f). The Court declines to find David Loeffler in contempt for aiding and abetting a violation of paragraph 15(d) of the First Supplemental Writ.

As a sanction for these violations, the Court hereby orders the Lees to pay $370,-540 to Paliafito. The Court further orders that the Lees pay that portion of Paliafito's attorneys' fees and costs attributable to their contempts. Paliafito shall submit a bill of costs within thirty (30) days of this order; the Lees must submit any objections they have to this bill of costs within twenty-one (21) days of Paliafito's submission.

**SO ORDERED.**